NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,

v.

Jerry D. ALEXANDER and Margaret F. Alexander, John D. Alstadt, Arlene E. Barton, Constance L. Biddle and James E. Biddle, Theodore C. Burgdorf and Lois M. Burgdorf, Ravinder N. Chopra and Mohini Chopra, Larry J. Flynn, G. Michael Fratto, Henry R. Frost and Annette G. Frost, David H. Garfield, Lawrence L. Gore, Howard A. Johnson, Lenny A. Kark, William Pope, David J. Robert, Carl Scheer, Edward E. Singleton, John R. Smith, Donald R. Sumner, Sandra M. Wadsworth, Stephen P. Walker, III and Michael Willet, Defendants.

No. 86 Civ. 9636 (LLS).

United States District Court, S.D. New York.

Dec. 21, 1989.

Lewis E. Love, Jr., D'Amato & Lynch, New York City, for plaintiff.

Leslie D. Corwin and Jeffrey M. Duban, Morrison Cohen Singer & Weinstein, New York City, for defendants.

## OPINION AND ORDER

STANTON, District Judge.

National Union Fire Insurance Company of Pittsburgh ("National Union"), an issuer of financial guarantee bonds, sues to enforce indemnity agreements between itself and limited partners in a tax shelter limited partnership, and to enforce its rights as subrogee on the limited partners' promissory notes which it honored on their behalf. National Union issued bonds which guaranteed, to the partnership and to the bank that financed the partnership, that the limited partners would make all of the capital contributions represented by their promissory notes to the partnership. The defendant limited partners stopped making their required contributions, and National Union made them on their behalf. Now it sues them for reimbursement, under the indemnity agreements they gave National Union at the time it guaranteed their payments, and as subrogee on the notes on which they defaulted.

National Union moves for leave to amend the complaint, for summary judgment on its claim for reimbursement, and to strike defendants' affirmative defenses. The defendants move for summary judgment dismissing the complaint. National Union's motion for leave to amend the complaint is granted, its motion for summary judgment is denied in part and granted in part, and its motion to strike defendants' affirmative defenses is denied. The defendants' motion for summary judgment is denied.

## BACKGROUND

In 1983 the defendants purchased limited partnership interests in Sunward Diversified Properties, Ltd. ("Sunward"), a Missouri limited partnership. Sunward's purpose was to raise capital by selling limited partnership interests in order to invest in other limited partnerships which owned and operated apartment complexes in Texas and Oklahoma. Investors would make a cash down payment, and sign a promissory note (the "note") for the balance of the purchase price of their limited partnership interests. The anticipated return to the limited partners included tax deductions as well as profits from the sale of the apartment complexes.

Defendants Arlene Barton, David H. Garfield, William Pope, Edward E. Singleton, and John R. Smith (collectively the "Group One defendants") signed notes that provide:

> For value received, I promise to pay to the order of Sunward ... at its offices in ... Texas ... or at such other place as the Holder may designate by written notice, ___[1] and No/100 Dollars ($___), plus interest on or before March 15, 1984, ___ and No/100 Dollars ($___), plus interest on or before March 15, 1985, ___ and No/100 Dollars ($___), plus interest on or before March 15, 1986, ___ and No/100 Dollars ($___), plus interest on or before March 15, 1987, and ___ and No/100 Dollars ($___), plus interest on or before March 15, 1988.

---

1. The defendants presumably filled in the amount they chose to invest. The minimum investment permitted required an investor to make a cash down payment of $5,500, and make payments under the note of: $8,000 by March 15, 1984, $8,000 by March 15, 1985, $8,000 by March 15, 1986, $7,500 by March 15, 1987, and $13,500 by March 15, 1988.

Interest shall accrue from the date written above to the date of payment at the lesser of the maximum rate allowed by law or two percent (2%) above the "prime rate" then being charged (adjusted on a daily basis) by the Cullen/Frost Bank of Dallas, N.A.

\* \* \* \* \* \*

This Note shall be construed in accordance with the laws of the State of Texas.

The remaining defendants (collectively "the Group Two defendants") signed notes that differed from the Group One defendants' notes. Their notes did not tie the interest rate before maturity to the prime rate, but rather only provided for "interest". The notes state:

For value received, I promise to pay to the order of Sunward ... at its offices in ... Texas ... or at such other place as the Holder may designate by written notice, ___ and No/100 Dollars ($___), plus interest on or before March 15, 1984, ___ and No/Dollars ($___), plus interest on or before March 15, 1985, ___ and No/Dollars ($___), plus interest on or before March 15, 1986, ___ and No/Dollars ($___), plus interest on or before March 15, 1987, and ___ and No/Dollars ($___), plus interest on or before March 15, 1988.

However, the interest rate after default was tied to the prime rate:

Interest shall accrue at the lesser of the maximum rate allowed by law or two percent (2%) above the "prime rate" then being charged (adjusted on a monthly basis) by the Cullen/Frost Bank of Dallas, N.A., in the event said sums are not paid within ten (10) days from the date due the Limited Partnership.

The Sunward private placement memorandum ("PPM") stated that Sunward would assign the notes to Union Planters National Bank of Memphis (the "Bank"), in return for a loan of working capital. The PPM also provided that National Union would supply a surety bond which would guarantee payment by the limited partners of their notes to the Bank.

National Union requested the limited partners to complete applications for the bond which stated:

The Undersigned acknowledges that this Application does not bind [National Union] to guarantee the Undersigned's credit, but the Undersigned hereby agrees that this Application shall be the basis of the contract should [National Union] guarantee the Undersigned's credit and issue its surety bond, and the Undersigned, by his signature hereto, shall be bound with [National Union] individually and severally as a Principal under such surety bond.

A copy of the proposed bond was not provided to the defendants.

The limited partners were required to execute indemnity agreements whereby they agreed to reimburse National Union for any payments it made on the notes to the Bank on their behalf. In addition, the limited partners were required to pledge their partnership interests as security for their obligations to the surety under the indemnity agreements.

The indemnity agreements provide:

The Undersigned will protect, indemnify, and save harmless [National Union] from and against any and all liability, loss, costs, damages, fees of attorneys, and other expenses which [National Union] may sustain or incur under or in connection with the policy or bond issued to the Partnership, or in connection with this Indemnification and Pledge Agreement, for:

(a) sums paid to the Partnership or its assigns to cure the Undersigned's Default under, or to purchase the Undersigned's Note[.]

When the defendants failed to make payments on their notes in 1985 and 1986, National Union paid the Bank on their behalf. On December 16, 1986 National Union commenced this diversity suit. It claims that it is entitled to reimbursement, both under the indemnity agreements and as subrogee of the Bank on the promissory notes, for the funds it has paid on the defendants' behalf. National Union asserts that any personal defenses the defen-

dants may have against the partnership are cut off because the Bank took the note as a holder in due course, and that as subrogee to the extent that it has made payments under the notes, National Union has the same rights as the Bank.

The defendants claim that National Union cannot recover under the indemnity agreements because the PPM and indemnification agreements led them to believe that National Union would issue a "typical" surety bond, which would require National Union to raise their defenses to payment on the notes. However, the bond National Union issued provided:

Defenses available to the Surety or any Principal against the Obligee or Permitted Assignee to deny payment of the Notes or of a claim under this Bond due to acts or omissions of the Obligee or Permitted Assignee, or other entity or person shall not be valid against the Permitted Assignee. Such defenses include but shall not be limited to:

a) the invalidity of any Note;

b) the illegality of any Note;

c) the unenforceability of any Note;

d) the bankruptcy of the Obligee or any Principal;

e) any defense that the Principal is under no obligation to discharge all or any

part of its obligations to the Obligee, Permitted Assignee, or any other person under the Note, including any defense relating to the assignment of the Notes or any Principal(s) interest in the Obligee to the Permitted Assignee; and

f) any defense based upon the failure of any Principal to execute this Bond or the failure of the Obligee to perform its obligations under this Bond. . . .

Defendants assert that by issuing a bond that waived their defenses to payment National Union breached its contract with them. They also claim that by failing to disclose that the bond would waive their defenses to payment, National Union committed fraud in the inducement and fraud in the factum.

Defendants argue that National Union is not subrogated to the rights of a holder in due course of the notes because the notes are nonnegotiable. Accordingly, they claim that National Union is subject to their defenses of (1) failure of consideration, (2) non-performance of a condition precedent, and (3) illegality of the transaction. Those defenses arise from Sunward's failure timely to file an amended partnership certificate, as required by Missouri law [2], and as called for in the Partnership Agreement [3], and the PPM [4], which would

---

2. The partnership had to comply with Missouri law because it was a Missouri limited partnership. Section 359.080 of the Missouri Uniform Limited Partnership Act, 18 Mo.Rev.Stat. § 359.080 (Vernon 1962) (repealed effective January 1, 1989) provides "[a]fter the formation of a limited partnership, additional limited partners may be admitted upon filing an amendment to the original certificate in accordance with the requirements of section 359.250." Section 359.250 (repealed effective January 1, 1989) provides:

1. The writing to amend a certificate shall— (2) Be signed and sworn to by all members, and an amendment . . . adding a limited . . . partner shall be signed also by the member to be . . . added. . . .

5. A certificate is amended . . . when there is filed for record in the office of recorder of deeds of the county where the certificate is recorded:

(1) A writing in accordance with the provisions of subsection . . . 2 of this section. . . .

6. After the certificate is duly amended in accordance with this section, the amended certificate shall be for all purposes the certificate provided for this by this chapter.

3. The Partnership Agreement defined a limited partner as "any of the persons admitted to the Partnership pursuant to Section 4.03(a)". That section provides:

Each Person who desires to be a Limited Partner shall execute one (1) counterpart of a Limited Partner Subscription Agreement, substantially identical to Exhibit C to the [PPM], and one (1) Promissory Note, identical to the form of Exhibit D to the [PPM] and the corresponding Indemnification and Pledge Agreement referred to therein. Upon (1) execution and delivery of such documents; (2) approval by the General Partners of each investor's Subscription Agreement; (3) payment in the amount of the first installment due from such Person, . . . to the Managing General Partner or his designee; and (4) filing of an amended Certificate, such Person shall be admitted to the Partnership as a Limited Partner.

4. The PPM stated that the Partnership would close when "Limited Partner Subscriptions for Interests totaling at least $1,262,500 but not more than $1,767,500 have been received and accepted by the General Partners and said Lim-

have admitted the defendants into the partnership. The certificate was filed only after Sunward filed for bankruptcy.

The defendants assert that even if the notes are negotiable, the Bank took them with notice of their defenses to payment, and thus did not take them as a holder in due course.

## DISCUSSION

### 1. Motion to Amend

National Union moves to amend its complaint to include sums it paid the Bank because of defendants' failure to make payments due on the notes in 1987 and 1988. Defendants do not oppose this motion.

Fed.R.Civ.P. 15(a) provides, in pertinent part, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), stated "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, ..., undue prejudice to the opposing party by virtue of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' " *See also S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2d Cir.1979).

Accordingly, National Union's request to amend its complaint is granted.

### 2. Summary Judgment

Under Fed.R.Civ.P. 56(c) the moving party on a summary judgment motion bears the burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The non-movant may defeat the motion by establishing the existence of evidence sufficient to raise issues of fact material to the essential elements of the claim. *Id.* at 322, 106 S.Ct. at 2552. The court must "resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). However, the non-movants may not rest upon conclusory allegations or denials to defeat the motion, but rather must provide "concrete particulars" in the form of supporting facts or arguments in opposition. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984).

### (A) The indemnity agreement

#### (1) Defendants' claims

##### (i) Breach of contract

■ The applications stated that if National Union decided to guarantee their credit, National Union would issue a "surety bond". The indemnification agreements provided that National Union would issue a "bond" that would guarantee the defendants' credit. Defendants argue that the references to a surety bond and bond meant National Union would issue a "typical" surety bond, i.e., one that would have preserved their defenses to payment. Accordingly, by issuing a bond that waived their defenses to payment National Union breached the indemnification agreements.[5]

National Union responds that (1) the indemnification agreements and applications left the terms of the bond in National Union's discretion, and (2) given the nature of this transaction, the defendants should have known that the Bank wanted an unconditional guarantee of their notes.

■ Resolution of this issue requires an explication of the different types of

---

ited Partners are admitted to the Partnership (by filing of an Amended Agreement)."

**5.** The defendants claim that the bond National Union issued was the functional equivalent of a "letter of credit." Section 5–103(1)(a) of the Uniform Commercial Code defines "credit" or "letter of credit" as "an engagement by a bank or other person made at the request of a customer ... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit."

suretyship. One form of suretyship is conditional—the surety "agrees to back up the obligation of another, termed the 'principal' or 'principal debtor', the latter bearing the primary burden of performing for the creditor." *Rhode Island Hospital Trust National Bank v. The Ohio Casualty Insurance Co.*, 789 F.2d 74, 77 (1st Cir.1986) citing 10 W. Jaeger, *Williston on Contracts*, § 1211, at 683 (3d ed. 1967) ("Williston") and L. Simpson, *Simpson on Suretyship* 4–7 (1950) ("Simpson"). A conditional surety is "generally not liable on his undertaking unless his principal is liable and in default on the underlying debt. The defenses of the principal are available to the surety and, if the underlying debt is cancelled, the surety's obligation ceases." *Asociacion De Azucareros De Guatemala v. United States National Bank of Oregon*, 423 F.2d 638, 641 (9th Cir.1970) citing *RESTATEMENT OF SECURITY*, § 122 (1941). A conditional surety who pays a creditor knowing that an investor has a defense to payment is not entitled to reimbursement.[6] *U.S. v. Griffin*, 707 F.2d 1477, 1480–81 (D.C.Cir.1983); *RESTATEMENT OF SECURITY*, § 108(1)(b).

A second form of suretyship is unconditional—"so that the surety promises to pay no matter how valid the reason for the principal's failure." *Rhode Island Hospital*, 789 F.2d at 79, citing *Williston*, § 1255 at 814 ("the surety by the terms of his promise has agreed to perform if the principal fails to make the stated payment or performance, however valid the reason for his failure") and *Simpson*, 327.

Here, the clause in the bond waiving the principals' defenses to payment on the notes created an unconditional surety bond. The parties disagree whether the references to a "surety bond" and "bond" in the applications and indemnification agreements meant that National Union would issue such an unconditional guarantee. Defendants James E. Biddle, Constance L. Biddle, Ravinder N. Chopra, Mohini Chopra, Larry J. Flynn, G. Michael Fratto, William Pope, Edward E. Singleton, John R. Smith, Stephen P. Walker, III, and Michael Willet each aver that

> it was my understanding that a bond, such as the one National Union represented it would use in the Sunward deal, does not include such a waiver of defenses. Had I known that National Union's Sunward Bond contained a waiver of defenses, purporting to absolutely and unconditionally obligate my Note payments, I would not have subscribed to the Partnership.

> It was, instead, my understanding that National Union's Bond would be conditional to the extent it allowed National Union to assert a defense that I, or any coinvestor, as principals under the Bond, might have to payment. Exhibit B to affidavit of Jeffrey M. Duban, Esq. sworn to March 28, 1989.

The manager of National Union's Comprehensive Financial Risk Division, Irving V. Goldstein, states

> at the time National Union made its forms of investor application and indemnification and pledge agreement available to Sunward and/or its insurance broker, it had no reason to believe that any prospective investor in Sunward would interpret the term "surety bond" to exclude bonds whereby National Union, as surety, would waive its defenses to payment of the principals' obligations and provide an unconditional guarantee of the principals' notes. And, since no investor contacted National Union prior to the issuance of the Bond, National Union had no knowledge or reason to believe that any language contained in either of those forms mislead any investor. Furthermore, I did not, nor did any one else in the Comprehensive Financial Risk Division that I knew of, believe that the term "surety bond" was inappropri-

---

**6.** It appears that National Union first learned of the defendants' possible defenses to payment when counsel for defendant Stephen P. Walker, III wrote it on July 22, 1985, stating "National Union, together with the General Partners and the Bank, is liable for the Walkers' rescission of their purchase of the Interest due to National Union's participation in an offering of securities in violation of state and federal securities laws." Exhibit H to affidavit of Jeffrey M. Duban, Esq. sworn to February 2, 1989.

ate to characterize the financial guarantee bond which National Union had conditionally undertaken to provide to Sunward. Affidavit of Irving V. Goldstein, sworn to March 10, 1989.

Because there are different types of suretyship, the use of the terms "surety bond" and "bond" in the applications and indemnification agreements was ambiguous, and, understandably, the parties have a factual dispute concerning their meaning. Therefore, resolution of defendants' breach of contract claim must await trial.[7] *See Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559 (2d Cir.1989) ("When a written contract is ambiguous, a triable issue of fact exists as to its interpretation, thus precluding the entry of summary judgment."); *Aetna Casualty & Surety Co. v. Giesow,* 412 F.2d 468, 471 (2d Cir.1969) ("Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper.")

It should be noted that resolution of defendants' breach of contract claim at trial will also affect another issue: whether the bond actually waived the principals' defenses to payment. The defendants assert, as an affirmative defense, that the bond did not waive their defenses to payment because they never knowingly consented to the waiver. "A waiver is an intentional or voluntary relinquishment or abandonment of a known right." *U.S. v. Bedford Associates,* 491 F.Supp. 851, 868 (S.D.N.Y.1980) (citing cases). The determination whether the parties contemplated a conditional, or an unconditional, surety bond may conclude the issue whether there was such a waiver.

*(ii) Fraud in the inducement and fraud in the factum*

■ Whichever way the waiver issue is resolved, defendants cannot claim that National Union committed fraud in the inducement or fraud in the factum. If the defendants consented to the waiver of their defenses to payment, they cannot claim that

National Union committed fraud by waiving their defenses to payment. If the defendants did not consent to the waiver, they cannot claim fraud because the waiver would be ineffective as to them, and they could still assert their defenses against the Bank and National Union.

Accordingly, that part of defendants' motion seeking summary judgment on the ground that National Union committed fraud in the inducement and fraud in the factum is denied.

*(B) The promissory notes*

(1) Choice of law

■ The Group One defendants' notes provide that they shall be governed by Texas law. The Group 2 defendants' notes do not contain a choice of law provision. The defendants urge that those notes should be construed under Texas law. This court, sitting in diversity, looks to New York choice of law principles to determine which state's law applies to the Group 2 defendants' notes. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Under New York law, the general rule is that a note is to be governed by the laws of the place where it is made, unless by its terms it is to be performed elsewhere. *See* 41 N.Y.Jur., Neg. Inst. § 82, p. 282 (citing cases). Here, the Group 2 defendants' notes were signed in the various states where the defendants reside, but call for payment in Texas. Accordingly, Texas law applies to the Group 2 defendants' notes.

(2) Negotiability

A "holder", as defined in Texas Uniform Commercial Code ("U.C.C.") § 1.201(20), Tex.Bus. & Com.Code Ann. § 1.201(20) (Vernon 1968), is a person who is in possession of "a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer in blank." An "instrument" means a "negotiable instrument." *Id.* § 3.102(a)(5).

**7.** Accordingly, National Union's motion for summary judgment on its claim for reimbursement under the indemnification agreements is also denied.

To be negotiable, an instrument must contain an unconditional promise or order to pay a sum certain. *Id.* § 3.104(a)(2). Section 3.106 states that: "(a) The sum payable is a sum certain even though it is to be paid (1) with stated interest or by stated installments; or (2) with stated different rates of interest before and after default or a specified date[.]" Official Comment 1 to § 3.106 states that:

> It is sufficient that at any time of payment the holder is able to determine the amount then payable from the instrument itself with any necessary computation ... The computation must be one which can be made from the instrument itself without reference to any outside source, and this section does not make negotiable a note payable with interest "at the current rate."

### (i) The Group One defendants' notes

■ The Group One defendants' notes provide for interest at the "lesser of the maximum rate allowed by law or two percent (2%) above the 'prime rate' then being charged (adjusted on a daily basis) by the Cullen/Frost Bank of Dallas, N.A."

In *Hinckley v. Eggers*, 587 S.W.2d 448 (Tex.Civ.App.1979) a deed of trust note provided that the maker's personal liability was *"that dollar amount equal to all taxes which are or shall become due and payable on the property* covered by the Deed of Trust for the then current year". *Id.* at 450 (emphasis in original). The court held that the note was nonnegotiable for failure to state a sum certain "within section 3–104(a)(2) because the amount of the taxes can be determined only from sources outside the instrument." *Id.* at 451.

Similarly, the rate of interest in the Group One defendants' notes can only be calculated by reference to a source outside the instrument, the prime rate then being charged by the Cullen/Frost Bank of Dallas, N.A. Accordingly, the interest provision renders those notes nonnegotiable. U.C.C. § 3.106, comment 1.[8] *Accord, Taylor v. Roeder*, 234 Va. 99, 360 S.E.2d 191 (1987) (interest at "three percent (3%) over Chase Manhattan Prime to be adjusted monthly" renders note nonnegotiable); *Morris v. Columbia National Bank*, 79 B.R. 777 (N.D.Ill.1987) (interest at three percent over prime rate renders note nonnegotiable); *Northern Trust Co. v. E.T. Clancy Export Corp.*, 612 F.Supp. 712 (N.D.Ill.1985) (interest at ½% above prime renders note nonnegotiable); *A. Alport & Son, Inc. v. Hotel Evans, Inc.*, 65 Misc.2d 374, 317 N.Y.S.2d 937 (Sup.Ct.1970) (interest "at bank rates" renders note nonnegotiable); *Centerre Bank of Branson v. Campbell*, 744 S.W.2d 490 (Mo.Ct.App. 1988) (interest that "may vary with bank rates charged" to payee renders note nonnegotiable); *see also* 4 Hawkland, U.C.C. Series § 3–106:03 at 95 n. 5; 2 Hart & Willier, Bender's U.C.C. Series § 2.11[2] at 2–103; Leary, U.C.C. Handbook at 95.

Since the Group One defendants' notes are nonnegotiable the Bank cannot be a holder of them in due course. Moreover, they are governed by contract law rather than the U.C.C. *Business Aircraft Corp. v. Electronic Communications, Inc.*, 391 S.W.2d 70, 71 (Tex.Civ.App.1965).[9] Accordingly, National Union, as subrogee, stands in the shoes of its subrogor, the Bank, and is subject to the Group One defendants' defenses to payment on their notes.

However, the waiver in the bond, if valid,[10] would prevent the Group One defendants from asserting their defenses to payment. Thus, whether the Group One defendants can assert their defenses, and whether those defenses defeat National

---

**8.** *Cf. Brazos River Authority v. Carr*, 405 S.W.2d 689, 695–697 (Tex.Sup.Ct.1966) (holding that bonds that bore interest at one percent per annum plus, on supplemental coupons, "up to 2½% additional interest per annum to the extent net revenues are available" were not negotiable instruments because the supplemental coupons' indefinite interest rate failed to state a sum certain under section 3.106.)

**9.** *Cf.* U.C.C. 3.805 ("This chapter applies to any instrument whose terms do not preclude transfer and which is otherwise negotiable within this chapter but which is not payable to order or to bearer, except that there can be no holder in due course of such an instrument.")

**10.** See *supra*, pp. 13–14.

Union's claim to reimbursement, must await determination of their breach of contract claim.

### (ii) The Group Two defendants' notes

■ The Group Two defendants' notes provide for "interest" before default, and for interest "at the lesser of the maximum rate allowed by law or two percent (2%) above the 'prime rate' then being charged (adjusted on a monthly basis) by the Cullen/Frost Bank of Dallas, N.A." after default.

U.C.C. section 3.118(4) provides "Unless otherwise specified a provision for interest means interest at the judgment rate at the place of payment from the date of the instrument, or if it is undated from the date of issue." Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 (Vernon 1987) provides for a 10% judgment rate of interest.

Because section 3.118(4) supplies the missing interest rate, the Group Two defendants' notes are negotiable. *See Universal C.I.T. Credit Corp. v. Ingel*, 347 Mass. 119, 196 N.E.2d 847, 851 (1964) (note payable "with interest" clearly negotiable because section 3.118(4) supplies the missing rate of interest).[11]

That the notes call for interest at two percent above the Cullen/Frost Bank's prime rate after default does not render them nonnegotiable. In *National Union v. Tegtmeier*, 673 F.Supp. 1269 (S.D.N.Y. 1987), a note provided for interest at two percent above RepublicBank's prime rate after default. This court held that that provision did not render the note nonnegotiable:

> After a default, the negotiability of the note is irrelevant. Hart & Willier state that "Once an instrument has matured, it no longer has its function as a money substitute and it is immaterial whether it is payable thereafter in a sum certain. No person can become a holder in due course, and it will not circulate in the

business community." Hart & Willier, *supra*, at 2–103 (footnote omitted). Once there has been a default on the note, no person who has notice of the default can become a holder in due course. U.C.C. § 3–302(1)(c). It is clear from the face of the note that is payable on a specific date whether there has been a default, giving the potential purchaser notice that is overdue.

> After a default, the note is no longer transferable except subject to the personal defenses of the maker. It is therefore irrelevant that the amount due after a default is not a sum certain. As long as the interest due can be computed from the face of the note itself at the time payment is due, it is immaterial that computation of the interest due after a default requires reference to an outside source. *Id.* at 1273.

Thus, the Bank could take these notes as a holder in due course.

### (3) Holder in due course status

A holder in due course, "is a holder who takes the instrument (1) for value; and (2) in good faith; and (3) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." U.C.C. § 3.302. Section 3.305 defines the rights of a holder in due course. It provides that:

> To the extent that a holder is a holder in due course he takes the instrument free from (a) all claims to it on the part of any person; and (b) all defenses of any party to the instrument with whom the holder has not dealt except (1) infancy, to the extent that it is a defense to a simple contract; and (2) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and (3) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor

---

**11.** *See also* Hart & Willier, at 2–115 ("Although it could be argued that Section 3–118 deals only with the construction of an instrument and not its negotiability, the section would have no use if it were held that those instruments at which it were aimed were not within Article 3 because they failed to meet the requirements of Section 3–106. It is also significant that Section 3–106 does not require that there be a stated *rate* of interest, only that the interest provision be stated.") (emphasis in original)

reasonable opportunity to obtain knowledge of its character or its essential terms; and (4) discharge in insolvency proceedings; and (5) any other discharge of which the holder has notice when he takes the instrument.

A subrogee is entitled to the same rights as the holder of the note, except that he may not improve his position by asserting the rights of the holder if he has been a party to any fraud or illegality affecting the instrument. U.C.C. § 3.201(a) provides that:

> Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

### (i) Bad faith

■ The defendants assert that the Bank took the notes in bad faith because it should have attempted to investigate whether an amended certificate had been filed. But the defendants have made no showing that the Bank had "actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments[.]" *Chemical Bank v. Haskell*, 51 N.Y.2d 85, 92, 432 N.Y.S.2d 478, 411 N.E.2d 1339 (1980); *see also Riley v. First State Bank, Spearman, Texas*, 469 S.W.2d 812, 816 (Tex.Civ.App.1971) ("The test is not diligence or negligence; and it is immaterial that [the Bank] may have had notice of such facts as would have put a reasonably prudent person on inquiry which would lead to discovery, unless [the Bank] had actual knowledge of facts and circumstances that would amount to bad faith.") Absent notice, the Bank had no duty to investigate whether an amended certificate was filed. *See Manufacturers and Traders Trust v. Sapowitch*, 296 N.Y. 226, 230, 72 N.E.2d 166 (1947) (purchaser of commercial paper "does not owe to the party who puts negotiable paper afloat the duty of active inquiry, to avert the imputation of bad faith").

Accordingly, the Bank took the notes in good faith.

### (ii) Notice

■ The defendants claim the Bank had actual knowledge of their defenses to payment "because it is chargeable with knowledge of applicable law requiring the filing of an Amendment and because the Partnership Agreement and PPM, which accompanied negotiation of the Note and on which the Bank relied, so provided." (Defendant's memo in opposition, pp. 51–52).

Even assuming that the Bank was aware that Missouri law, the Partnership Agreement, and the PPM required the filing of an amended certificate to admit limited partners, the defendants have failed to show that the Bank knew an amended certificate was not filed. *See Sundsvallsbanken v. Fondmetal, Inc.*, 624 F.Supp. 811, 818 (S.D.N.Y.1985) ("notice of defenses against an instrument means actual subjective knowledge of defenses, and not the mere existence of suspicious circumstances").

Accordingly, the Bank took the Group 2 defendants' notes without notice of their defenses to payment. Since the defendants do not contest that the Bank took their notes for value, the Bank is a holder in due course.

National Union, as subrogee of the Bank, is then subject only to the defendants' defense of illegality.

### (iii) Illegality

■ Comment 6 to 3.305 states:
Illegality is most frequently a matter of gaming or usury, but may arise in many other forms under a great variety of statutes. The statutes differ greatly in their provisions and the interpretations given them. They are primarily a matter of local concern and local policy. All such matters are therefore left to the local law. If under that law the effect of the ... illegality is to make the obligation entirely null and void, the defense

may be asserted against a holder in due course. Otherwise it is cut off.

Under Section 359.110 of the Missouri Uniform Limited Partnership Act, 18 Mo. Rev.Stat. § 359.110 (Vernon 1962) (repealed effective January 1, 1989),

A person who has contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership, is not, by reasons of his exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership; provided that on ascertaining the mistake he promptly renounces his interest in the profits of a business, or other compensation by way of income.

Here, defendants contributed to the capital of Sunward erroneously believing that they had become limited partners in it. Thus, under section 359.110 they could have renounced their interests in the partnership after they discovered that they were not admitted into it. However, section 359.110 does not treat the failure to file an amended certificate as rendering the limited partners' obligations null and void. Since the failure to file an amended certificate only resulted in the defendants' obligations being voidable, they have failed to make out a defense of illegality.

Because the defendants have failed to establish a defense that could defeat the Bank's rights to payment as a holder in due course, National Union is entitled to reimbursement as subrogee to the Bank's rights under the notes. Accordingly, that part of its motion seeking summary judgment on its claim for reimbursement as subrogee to the Bank's rights under the Group Two defendants' notes is granted.

3. Motion to strike affirmative defenses

Fed.R.Civ.P. 12(f) states:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

■ Since National Union did not move to strike defendants' affirmative defenses within twenty days after it was served with the answer, its motion is untimely. However, the court's power to strike a defense on its "own initiative at any time" allows it to consider untimely motions to strike. *See Ciminelli v. Cablevision*, 583 F.Supp. 158, 161 (E.D.N.Y.1984) (citing cases).

■ A motion to strike affirmative defenses is decided on the basis of the pleadings alone. *Ciprari v. Servicos Aereos Cruzeiro do sul S.A.*, 245 F.Supp. 819, 820 (S.D.N.Y.1965), *aff'd*, 359 F.2d 855 (2d Cir.1966). An affirmative defense is "immaterial if it bears no essential or important relationship to the primary claim for relief, and is impertinent if it contains statements that do not pertain to or are unnecessary to the issues in question." *Federal Savings and Loan Insurance Corp. v. Burdette*, 696 F.Supp. 1183, 1186 (E.D.Tenn.1988) citing *FDIC v. Berry*, 659 F.Supp. 1475, 1479 (E.D.Tenn.1987) and *FDIC v. Butcher*, 660 F.Supp. 1274, 1277 (E.D.Tenn.1987). An affirmative defense "is insufficient if, as a matter of law, the defense cannot succeed under any circumstances." *Id.* at 1186 citing *Brown & Williamson Tobacco Corp. v. U.S.*, 201 F.2d 819, 822 (6th Cir.1953) and *U.S. v. Hardage*, 116 F.R.D. 460, 463 (W.D.Okla.1987).

Here, the defendants' affirmative defenses that the notes were nonnegotiable, the Bank was not a holder in due course, and the Bank took the notes subject to the defense of illegality did not defeat National Union's claim for summary judgment as subrogee to the Bank's rights under the Group Two defendants' notes. Those defenses failed because they were not supported by the facts, not because they were insufficient as a matter of law. Moreover, they are still at issue with respect to National Union's claim for reimbursement as subrogee to the Bank's rights under the

Group One defendants' notes. Thus, they should not be stricken from defendants' answer.

With respect to the remainder of defendants' affirmative defenses, they are neither insufficient as a matter of law, redundant, immaterial, impertinent, or scandalous.

Accordingly, National Union's motion to strike defendants' affirmative defenses is denied.

## CONCLUSION

National Union's motion for leave to amend the complaint is granted. Its motion for summary judgment is granted in part, and denied in part. Its motion to strike defendants' affirmative defenses is denied. The defendants' motion for summary judgment dismissing the complaint is denied.