210 F.Supp.2d 421 (2002)
In the Matter of the COMPLAINT OF RATIONIS ENTERPRISES, INC. OF PANAMA, as Owner, and Mediterranean Shipping Co. S.A. of Geneva, as Bareboat Charterer of the M/V "MSC CARLA" for Exoneration from or Limitation of Liability.
Cummins Engine Co., Inc., et al., Third-Party Plaintiffs,
v.
Hyundai Mipo Dockyard Co., Ltd., Third-Party Defendant.
No. 97 Civ. 9052(RO).
United States District Court, S.D. New York.
July 10, 2002.
*422 *423 Donovan, Parry, McDermott & Radzik, New York City, for Cummins Engine Co., Inc, et al., Edward Radzik, Marc I. Kunkin.
Burke & Parsons, New York City, for Hyundai Mipo Dockyard Co., Ltd., Christopher Dillon, Raymond J. Burke, Chan Woo Sung.
DeOrchis, Walker & Corsa, LLP, New York City, for Rationis Enterprises, Inc., Mediterranean Shipping Co. S.A., Vincent M. DeOrchis, William E. Lakis.
Hill, Rivkin & Hayden, LLP, New York City, for Tulip International A/S, et al., Raymond P. Hayden.
Bigham, Englar, Jones & Houston, New York City, for Abel & Schafer, Inc., et al., Robert Phillips.
Kennedy, Lillis, Schmidt & English, New York City, for Schreiber Foods International, Inc., et al., T.C. Murphy.
Cozen & O'Connor, New York City, for Qualipac Corp., et al., Christopher Raleigh.
Waesche, Scheinbaum & O'Regan, P.C., New York City, for Travers Tool Co., Inc., et al., Richard W. Stone.

OPINION AND ORDER
OWEN, District Judge.
Cargo claimants and third-party plaintiffs Cummins Engine Co., Inc., et al. ("Cummins") move to strike and/or dismiss third-party defendant Hyundai Mipo Dockyard Co., Ltd.'s ("HMD")[1] affirmative defense of lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12 and 56 on the grounds that HMD, with an office since 1992 in Englewood Cliffs, New Jersey, has forfeited this defense, is present within the 100 mile bulge area under Fed.R.Civ.P. 4(k), is present in New York under C.P.L.R. § 301, or, alternatively, conducts business in the United States as a whole. Previously, in the context of a motion to enjoin HMD from prosecuting a declaratory judgment action in Korea, I concluded that this court had personal jurisdiction over HMD. See In the Matter of the Complaint of Rationis Enterprises, Inc. of Panama, No. 97 Civ. 9052, 2000 WL 1015918 (S.D.N.Y. July 24, 2000). On appeal, the Court of Appeals reversed and remanded for further proceedings on the personal jurisdiction issue.[2]See In the Matter of Complaint of Rationis Enterprises, Inc. of Panama, 261 F.3d 264 (2d Cir.2001).
Some background is necessary. In November of 1997. the 289-meter M/V MSC Carla ("Carla") departed from Le Havre on a fully-laden westbound voyage to the United States. The ship had a cargo capacity *424 of 2858 TEUs,[3] and her eight cargo holds carried more than sixteen hundred shipping containers  including such varied items as cheese, ceramic tile, razor blades, heavy machinery, beer, perfume, automobile parts, furniture, porcelain dishes, lime-stone, and individuals' personal effects  destined for various ports and consignees. In an apparently bad storm near the Azores on November 24, 1997, the Carla broke in half. The bow half sank, and the stern half was towed to Gijon, Spain. Experts and attorneys representing various interests inspected the remains of the vessel in December 1997 and again in January 1998, which were then sold as salvage.
On December 9, 1997, the vessel's owner filed a petition for exoneration from or limitation of liability under the Limitation of Shipowners' Liability Act, 46 U.S.C. §§ 181 et seq. That Act provides a procedure in the exercise of admiralty jurisdiction that allows a single federal court to determine all relevant issues related to liability and limits the shipowner's liability to the salvage value of the vessel plus the value of freight then pending, should exoneration be denied.[4] There are approximately 1000 cargo claimants in the limitation proceeding. The current movants are a subset of that group.
In 1984, Hyundai Corporation undertook to lengthen Carla, then called Nihon, and HMD, as Hyundai Corporation's shipyard, elongated Carla from 275.22 meters to 289.49 meters, increasing its cargo capacity by 216 TEUs. HMD accomplished this by cutting the original hull in half at frame 146, installing a mid-body insert, and joining the two original sections to the new mid-section. In that fatal storm, the Carla broke in half near one of the welded hull seams joining the original hull with the mid-body insert manufactured and installed by HMD.
HMD was brought into this action in January 1998, when the cargo claimants in the limitation proceeding put the shipyard on notice that they intended to hold it jointly and severally responsible for the casualty, and invited it to participate in the surveys, inspections, and analyses of the Carla. HMD accepted that invitation, appointed metallurgists and naval architects and participated in the surveys, inspections, and analyses of the Carla. In September 1998, various cargo claimants began serving third-party complaints on HMD at HMD's New Jersey office. Since then, HMD has participated in all aspects of the overall proceeding, including numerous depositions held in the United States and various other parts of the world.
Plaintiffs move to strike and/or dismiss under Fed.R.Civ.P. 12(f) and 56. Under Rule 12(f), upon a motion of a party or on its own initiative at any time, the court may order stricken from any pleading any insufficient defense. While this rule requires a motion to strike be filed within 20 *425 days after service of the pleading upon the moving party, the court's power to strike a defense on its own initiative permits it to consider untimely motions to strike. See National Union Fire Insurance Co. of Pittsburgh v. Alexander, 728 F.Supp. 192, 203 (S.D.N.Y.1989). "A motion to strike an affirmative defense under Rule 12(f) . . . for legal insufficiency . . . will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." Salcer v. Envicon Equities Corp., 744 F.2d 935, 939 (2d Cir.1984) (citations omitted), reversed on other grounds, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986). With regards to Rule 56, "[f]or a plaintiff to prevail on summary judgment when defendant contests personal jurisdiction . . . he must demonstrate that there is no genuine issue as to any material fact on the jurisdictional question. . . . The court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757, 762 (2d Cir.1983) (citations omitted).
To be determined first is whether HMD forfeited its defense of lack of personal jurisdiction. There are two issues: (1) did HMD miss the September 1, 1999 deadline for motions to dismiss based on jurisdictional issues which Magistrate Judge Pitman fixed in his scheduling order of May 12, 1999;[5] and/or (2) did HMD forfeit its defense of lack of personal jurisdiction by not bringing a motion earlier while participating actively for such a long period in the many-faceted proceedings.
I first address the issue of whether HMD missed the filing deadline. On April 5, 1999, Magistrate Judge Pitman issued an order, which among other things, stated that by April 22, 1999, all counsel desiring to be heard on the issue of a discovery schedule must submit a letter to his chambers setting forth their proposal. The deadline for these letters was later extended by Judge Pitman to May 3, 1999. The only letter Judge Pitman received was dated May 3, 1999 from John Eric Olson of Hill Rivkins & Hayden, LLP ("the Hill Rivkins letter"), which proposed that "[a]ny motions to dismiss . . . based on jurisdictional . . . issues should be filed by September 1, 1999." (emphasis supplied). The letter also stated that counsel for Rationis Enterprises, Inc. and MSC had no objection to the proposed schedule. HMD's attorneys admit receiving a copy of this letter. See Tr. at 39, 41. Thereafter, on May 12, 1999, Judge Pitman issued a Scheduling Order which recited that the Hill Rivkins letter was the only submission he received, and that "I hereby adopt the schedule proposed by Hill Rivkins," thereafter in his order making an additional specific provision that "[d]ispositive motions, seeking either dismissal, summary judgment or dispositive relief on any other basis, if any, shall be served and filed no later than July 3, 2000." (emphasis supplied).
HMD not only failed to file a motion to dismiss based on its assertion of lack of personal jurisdiction in the three-and-a-half months prior to September 1, 1999, but did not even assert, let alone move on, the defense until three months after that in December 1999 in response to third-party plaintiffs' motion for an anti-suit injunction. HMD contends that the Hill Rivkins letter was not part of the *426 record and, therefore, a nullity (Tr. at 28) because Judge Pitman did not "attach" it to his May 12 order (Tr. 29) or "refer to it by date" (Tr. 28), and, therefore, HMD regarded it as a "non-document." Thus, HMD contends that Judge Pitman continuously extended the time to so move by subsequent orders to even into the future from today. But those subsequent orders reveal the opposite of this position.
Judge Pitman's May 12, 1999 order clearly incorporated and made as his order the proposal in the single submission he had received, the Hill Rivkins letter, establishing a September 1, 1999 deadline to dismiss on jurisdictional grounds, and equally clearly he went on in his same order to add to  not modify  the Hill Rivkins jurisdictional grounds deadline, the later deadline of July 3, 2000 for motions to dismiss "on any other basis." Of his first four later orders, the first, February 10, 2000, in paragraph 8 thereof, extended the time in haec verba only as to the "on any other basis" category as he also did in his March 16, 2001 order. In two intervening orders, November 15, 2000 and January 4, 2001, he extended time but only to that category by incorporating said paragraph 8 from his earlier February 10, 2000 order without change. And while his last two scheduling orders of July 9, 2001 and August 21, 2001 extending time do not use the phrase "on any other basis" or indeed any language defining category, the language of those orders in no way can be read as a reinstatement of his by-then almost two year expired deadline to move to dismiss on the jurisdictional ground category.
Thus, HMD, by not filing a motion to dismiss for lack of personal jurisdiction before the September 1, 1999 deadline, forfeited the defense.
"[A] delay in challenging personal jurisdiction by motion to dismiss may result in waiver, even where the defense was asserted in a timely answer." Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 60 (2d Cir.1999) (citations omitted), cert. denied, 530 U.S. 1244, 120 S.Ct. 2691, 147 L.Ed.2d 962 (2000). In Hamilton, the Court concluded that the defendant had forfeited its defense of lack of personal jurisdiction which had been asserted in its answer "by participating in extensive pretrial proceedings and foregoing numerous opportunities to move to dismiss during the four-year interval that followed its inclusion of the defense in the answer." Id. at 59. One such opportunity, the court observed, was that the defendant could have moved during the first five months of the proceeding. The court further stated, "[t]hough such a motion would likely have encountered the Plaintiff-Appellant's demand for discovery on the jurisdictional issue, the motion would have served to precipitate such discovery and led to a discovery deadline and a prompt resolution of the issue." Id. at 61.
Here, HMD was put on notice in January 1998 by letter from the cargo claimants that it was being held responsible for the Carla casualty; HMD appointed metallurgists and naval architects and participated in the surveys, inspections and analyses of the Carla; in September 1998, the cargo claimants began serving third-party complaints on HMD; and throughout this period, HMD participated in depositions in locations around the world and other discovery. Although HMD included a defense of personal jurisdiction in its answers to the third-party complaints in October 1998, it waited until December 1999 to assert this defense.
HMD, which, as observed, has never yet made a motion to dismiss on jurisdictional grounds, contends that it would have been futile to move earlier. But Hamilton, supra, is the short answer to that contention. Thus, by participating in the litigation, including *427 full discovery, while not affirmatively asserting its jurisdictional defense in a timely manner, HMD forfeited that defense.
Even had HMD not forfeited its defense of lack of personal jurisdiction, this court would have general jurisdiction pursuant to Fed.R.Civ.P. 4(k), which allows for service of a third-party complaint even in an adjacent state but not more than 100 miles from the courthouse from which the summons issues,[6] due process being satisfied if the third-party defendant has minimum contacts with the 100 mile bulge area. See Flood v. Rite Aid of N.J., Inc., No. 84 Civ. 6502(CBM), 1986 WL 2965 at *2 (S.D.N.Y. March 4, 1986) (citing Coleman v. American Export Isbrandtsen Lines, Inc., 405 F.2d 250 (2d Cir.1968)). "The due process test for personal jurisdiction has two related components: the `minimum contacts' inquiry and the `reasonableness' inquiry." Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir.1996), cert. denied, 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996), 519 U.S. 1007, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). The minimum contacts inquiry with regards to general jurisdiction requires "the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." Id. at 568 (citations omitted). "[V]arious contacts . . . should not be examined separately or in isolation. . . . [C]ourts should assess the defendants contacts as a whole." Id. at 570 (emphasis in the original).
The minimum contacts inquiry requires the court to examine HMD's contacts within the bulge area over a period that is reasonable under the circumstances and going up to the time that the third-party suits began to be filed in 1998. HMD's first office for the solicitation of business in this area was opened in Fort Lee, New Jersey,[7] in 1979 or 1980. It maintained that office until approximately 1992 at which time the office was moved to Englewood Cliffs, New Jersey[8] to a building which at some point Hyundai Corporation, U.S.A. had or bought, and then leased space to HMD.[9]
*428 HMD admitted in its answer filed under date of October 27, 1998 that its New Jersey office "does business in the State of New Jersey and in the United States." HMD's Answer ¶ 2. In addition, Ga-In Choi, who has been at the New Jersey office since 1993, first as general manager and currently as director, testified at his deposition on November 6, 2000 that: (1) HMD has had an office in New Jersey since approximately 1980[10] (Choi Tr. at 12 and 16); (2) the Englewood Cliffs office at the time of his deposition had about ten rooms and some open space (id. at 15), five telephone lines, including fax and computer lines (id.), maintained bank accounts (id. at 81), an entertainment budget of about $2500 per month and a travel budget of $3000 - 4000 per month (id. at 82-83), and four employees (id. at 16); (3) the purpose of the office, Choi testified, is to generate business for HMD in New York, New Jersey, Connecticut, the United States, Canada and South America (id. at 17, 18, 27, 54, 82, and 89-90); (4) to generate business, Choi and the other employees visit clients to see "whether they have some plan for repair or conversions or new building. If they do, then we ask to give us a chance to quote." (id. at 27);[11] (5) contracts with U.S.-based customers are sometimes signed in the U.S. (id. at 30); (6) since 1982, the New Jersey office his been involved in the procuring of numerous contracts worth many millions of dollars with United States companies for the repair of ships (id. at 48, 49, 61, 62,[12] 63-64, 67-68, 71, 72, 88-89, 97-99, 112-14 and 115-16), which included an agreement to repair two ships for a California company in 1995 (id. at 97-99), an agreement, with a company based in New Jersey and New York to repair five ships in 1998 (id. at 115-16), and an agreement with a New Jersey company for the repair of five to ten ships in 1998-1999 (id. at 97-99); (7) in 1997, Choi and the New Jersey office were involved in the garnering of a $40,000,000 contract to build a freighter for a Massachusetts company (id. at 116-17); and (8) since at least 1997, HMD has set business *429 generation targets for its branch offices, the 2000 target for the New Jersey branch office being $200,000,000 (id. at 54 and 111-12).
Although for a period after the bulk of the third-party complaints were filed (one being filed as late as June 2000), others of Choi's statements are, if nothing else, clearly confirmatory of his statements of the large monetary volume the New Jersey office had achieved in the pre-complaint relevant years. Choi, in this regard, further testified: (1) in December 1999, he and the New Jersey office were involved in the signing of a ship building contract in New York City worth $37.4 million (id. at 31-32); (2) in 1999, he and the New Jersey office were involved in the signing of a multi-ship contract worth more than $200,000,000 with a New Jersey company, subject to that company arranging finances, which later fell through (id. at 74-76); and (3) in 2000, he and the New Jersey office were involved in the negotiations with a Connecticut firm for the building of two and possibly three ships at $29,000,000 per ship (id. at 33-34).
The above perhaps even singly, but certainly collectively amount to significant contacts in the bulge area that more than satisfy the minimum contacts required by due process.[13]
The second stage of the due process inquiry, the reasonableness analysis, involves the application of a five-factor test: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interests of the states in furthering substantive social policies." Metropolitan Life Ins. Co., 84 F.3d at 568. Where it has been determined that the defendant possesses minimum contacts with the forum, "dismissals resulting from the application of the reasonableness test should be few and far between." Id. at 575.
Analysis of the foregoing factors compels the conclusion that the exercise of jurisdiction over HMD is reasonable. While there may be some burden associated with HMD having to defend in New York, "the conveniences of modern communication and transportation ease what would have been a serious burden only a *430 few decades ago." Id. at 574. In addition, HMD has already for several years in this very case and others demonstrated its ability and desire[14] to travel around the world, attending depositions, making its witnesses available in New York for depositions and signing contracts with arbitration clauses requiring arbitration in the United States in general and New York in particular. Furthermore, the United States has an interest in adjudicating this matter here. Many of the cargo claimants are United States citizens, the stricken vessel was bound for the United States to deliver its cargo, and the major limitation proceeding from which this third-party action derives is here as an international dispute involving parties from many parts of the world with both the interests of the cargo claimants in obtaining convenient and effective relief and the efficient administration of justice, including avoiding duplicative litigation and potentially inconsistent judgments. These interests are best served by adjudicating as much of the proceeding in this forum as possible. Accordingly, the exercise of personal jurisdiction over HMD does not offend due process.
Thus, since concluding, following the hearing, that personal general jurisdiction exists under Fed.R.Civ.P. 4(k), I need not reach the issue of whether this court has personal jurisdiction over HMD by virtue of it being present in New York under C.P.L.R. § 301 or by conducting business in the United States as a whole, and the proceeding will go forward accordingly.
Finally, I need not reach the issue of the reimposition of an injunction against the Korean action going forward, which would involve a reassessment of the applicability thereto of China Trade and Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33 (2d Cir. 1987), since the parties have stipulated on the record that there is a standstill agreement as to the Korean action with two-weeks notice of any proposed action by any party to change the picture.
The foregoing is so ordered.
NOTES
[1] HMD is organized under the laws of the Republic of Korea.
[2] The Court of Appeals also vacated this court's injunction against HMD's Korean Court declaratory judgment action. The parties, however, did not place this in issue on this motion, and counsel for HMD stated at oral argument that the Korean action had been suspended. See Feb. 8, 2002 Tr. ("Tr.") at 22. Regarding the issue of personal jurisdiction, the Court of Appeals on its remand stated that it could not determine from the record whether HMD had forfeited its defense of lack of personal jurisdiction, and directed this Court to determine this issue, and if it were determined that the defense was not forfeited, then further proceedings should be had to determine whether this court has personal jurisdiction. See In the Matter of the Complaint of Rationis Enterprises, Inc., 261 F.3d at 268-69.
[3] A TEU is a twenty-foot equivalent unit of ocean container.
[4] In a limitation proceeding, the owner and/or the bareboat charterer of a vessel "may be exonerated from all liability if the court finds that cargo loss was due to certain factors, including Act of God, Peril of the Sea, or latent defect of the vessel not discoverable through due diligence." Mediterranean Shipping Co. S.A. Geneva v. Pol-Atlantic, 229 F.3d 397, 400 (2d Cir.2000). Should exoneration be denied, the Act still limits liability "to the value of the vessel and the freight pending . . . for the acts of the master or crew done without [the owner's and/or bareboat charterer's] privity or knowledge." Id. at 402 (quotations omitted). "`Freight then pending' means the total earnings of the vessel for the voyage, including charges for carriage of cargo and passengers." Id. at 400, n. 5. Should this limitation also be denied, the owner and/or bareboat charterer would be "liable without limitation for the full amount of any loss" Id. at 404.
[5] I note that HMD has never so moved, relying on various claims such as the "order" fixing the deadline was never part of an order, or that it was inadequately so communicated, or that it was suspended by subsequent orders of Judge Pitman. These are all extensively dealt with hereafter.
[6] See Landin v. E. Daskal Corp., 136 F.R.D. 363, 364 (S.D.N.Y.1991)
[7] One can take judicial notice that Fort Lee, New Jersey is within the 100 mile bulge area of this Courthouse at 40 Centre Street, New York, New York.
[8] One can also take judicial notice that Englewood Cliffs, New Jersey is within the 100 mile bulge area.
[9] In 1992, when HMD left Fort Lee, it had a tie-line in the Manhattan White Pages telephone directory  New York City area code 212- 594-3139  and that listing continued to exist in the Manhattan White Pages in the annual directory into the one for "September 2000 - August 2001." On the subsequent recent appeal in 2000, HMD denied the listing was its, stating, for example, that "the district court determined (incorrectly) that HMD had a Manhattan telephone listing" (see HMD's main brief at 16-17, and reply brief at 1, 6). This leading the Court of Appeals to state, "HMD, however, claims the telephone listing referenced does not belong to it, and appellees do not contradict that assertion." In the Matter of the Complaint of Rationis Enterprises, Inc., 261 F.3d at 269. However, when the listing appearing again in the following year's White Pages, and a copy of the page being put before me by "appellee" (supra) in an affidavit filed on November 16, 2001, on remand, HMD within weeks in a statement dated December 12, 2001 by the present director of its New Jersey office, Ga-In Choi, submitted under penalty of perjury, acknowledges at ¶ 14 that it was HMD's New York City listing when its office was at Fort Lee, stating that after the move to Englewood Cliffs in 1992 "it would seem it was dropped." This leaves the interesting question as to how it stayed in the Manhattan White Pages for nine years into the 2001 book with either HMD paying the monthly billings, or the phone company failing to discover it was not being paid and thus dropping it at some earlier point in the '90's
[10] Choi's business card in 2000 lists this office as the "U.S. Office;" and HMD's diagram of organization lists it as the "New York Office."
[11] This was specifically confirmed at the evidentiary hearing on May 28, 2002 by the testimony of Hugh Rynn, Sealand's director of fleet repair from 1994 to 1997. During that time, the HMD people from its New Jersey office were "constantly [at Rynn's office] soliciting business. And if you let them, they'd be there everyday." (Tr. 166). Rynn testified that Choi had a power of attorney and signed the various eventual contracts (Tr. 173). At Choi's request, Rynn talked Choi up to other shipping lines (Tr. 182). The above is a far cry from Choi's superior Moon Sung Byun's testimony, where at the outset he kept reiterating that the New Jersey office was only "to facilitate communication between the sales department in Korea and shipowners." (Tr. 9). However, after being pressed for 60 pages, he finally answered the court's question that the New Jersey office was "to try to get new clients?" by responding, "That goes without saying." (Tr. 69).
[12] This is also confirmed by Glen Moyer, who had worked at Sealand Services, Inc. referred to by Choi at page 62 of his deposition. Moyer states as of the year 2000 in his declaration, ¶¶ 4-6:

4. During the past seven or eight years, CSX Lines, and its predecessor Sea-Land, have entered into contracts with Hyundai Mipo Dockyard Co., Ltd. for the repair, overhaul and modification of several vessels including CSX HAWAII, CSX RELIANCE, CSX EXPEDITION and CSX SPIRIT.
5. The aggregate value of these contracts which CSX Lines paid to Hyundai Mipo Dockyard was approximately $5,000,000.
6. The negotiations surrounding these contracts and the execution of these contracts took place in New Jersey and involved Hyundai Mipo Dockyard personnel from both its United States office in New Jersey and its home office in Korea.
[13] HMD contends that the contacts of the N.J. office are not significant because, while the solicitation takes place in the United States, "the business on which they are solicited is not located in New Jersey or the United States." HMD's Memorandum of Law at 20. But see Seetransport Wiking Trader v. Navimpex Centrala, 989 F.2d 572 (2d Cir.1993), involving a foreign shipbuilder soliciting business in the United States, where the Court of Appeals for the Second Circuit upheld a finding of personal jurisdiction by the district court where the shipbuilder "had deliberately and not occasionally or casually, but with a fair measure of permanence or [sic] continuity . . . promoted ship sales through its . . . office in Manhattan." Id. at 580.

HMD also contends that in determining minimum contacts, evidence of post-complaint activity is not relevant. "In general jurisdiction cases, district courts should examine a defendant's contacts with the forum . . . over a period that is reasonable under the circumstances  up to and including the date the suit was filed  to assess whether they satisfy the `continuous and systematic' standard. The determination of what period is reasonable in the context of each case should be left to the court's discretion." Metropolitan Life Ins. Co., 84 F.3d at 569-70. There is an issue as to what post-complaint activity means in this case since there were over a dozen third-party complaints filed against HMD over the period September 1998 to June 2000, and there is evidence before me of continuous and substantial activity in and with the bulge area by HMD prior to 1998 and continuing through the present.
[14] On May 3, 2001, in Wade v. CSX Lines, et al., 00 Civ. 8032(SWK), another matter before Judge Kram of this court, HMD stipulated to withdraw its affirmative defense of lack of personal jurisdiction, and thereby submitted to the jurisdiction of the court. While this is not dispositive here, it does indicate an ability and even a desire by HMD to travel here to adjudicate certain issues.