**METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**ROBERTSON-CECO CORP., Defendant–Appellee,**

**UNITED DOMINION INDUSTRIES, INC., Defendant.**

**No. 663, Docket 95–7370.**

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1995.

Decided May 22, 1996.

Patrick E. Gaas, Houston, Texas (J. Mark Brewer, Brewer & Pritchard, P.C., Houston, Texas, David W.M. Conard, Samuel H. Press, Portnow, Little & Cicchetti, P.C., Burlington, Vermont, on the brief), for plaintiff-appellant.

Michael B. Clapp, Burlington, Vermont (Gary T. Carr, Bryan Cave, St. Louis, Missouri, Philip C. Woodward, Shapleigh Smith, Jr., Dinse, Erdmann & Clapp, Burlington, Vermont, on the brief), for defendant-appellee.

Before WINTER, WALKER and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

We address here, among other things, the limits of a district court's "general" jurisdiction over an out-of-state defendant where federal subject matter jurisdiction is premised solely on diversity of citizenship. In this instance, the plaintiff-appellant Metropolitan Life Insurance Company ("Met Life") filed suit in Vermont against defendant-appellee Robertson–Ceco Corporation ("Robertson")—based on alleged acts and omissions unconnected to the State of Vermont—in an apparent attempt to benefit from Vermont's arguably more generous statute of limitations. Met Life appeals from an Amended Opinion and Order of the United States District Court for the District of Vermont (Franklin S. Billings, Jr., *Judge* ), filed August 5, 1994, granting Robertson's motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

## I. BACKGROUND AND JURISDICTIONAL FACTS

On August 31, 1993, Met Life filed a complaint against Robertson and United Dominion Industries, Ltd. ("United Dominion") [1] in the United States District Court for the District of Vermont alleging, *inter alia,* state breach of contract and negligence claims. Robertson is a Delaware corporation with its principal place of business in Pennsylvania and is the successor to the 1989 merger of the H.H. Robertson Company and the Ceco Corporation. Met Life is a New York corporation with its principal place of business in New York.

This litigation involves the design, manufacture, and installation of a "curtain wall system"—the glass and steel or aluminum exterior walls commonly found on modern office buildings—by Robertson's Cupples Products Division, an unincorporated division located in St. Louis, Missouri.[2] According to Met Life, Robertson made various misrepresentations and supplied faulty curtain walls

---

1. United Dominion is incorporated in Ontario, Canada, with its principal place of business in North Carolina. In its complaint, Met Life alleged that United Dominion acquired all operations, assets, and liabilities of the Robertson division responsible for the acts alleged in the complaint. Summary judgment was granted in favor of United Dominion on March 14, 1995. It is not a party to this appeal.

2. Robertson claims to have sold its Cupples Division in 1994.

for the construction of the Flagship Banking Building in Miami, Florida, now owned by Met Life.[3] In its complaint, Met Life alleges that the stainless steel "face sheets" of the building's curtain wall system were "delaminating and deteriorating aesthetically and in structural integrity"—that is, buckling and falling off the building—causing damage to the building and surrounding property.

On February 15, 1994, Robertson moved to dismiss the suit for lack of personal jurisdiction, defects in service of process, and failure to state a claim upon which relief can be granted. Regarding the question of personal jurisdiction, Robertson argued that there was no allegation that Met Life's claims arose out of any business conducted by Robertson in Vermont, or that Robertson had a substantial and continuous presence in Vermont justifying the exercise of personal jurisdiction. Met Life responded by filing a notice of intent to depose a corporate representative of Robertson on forty-nine topics relating to Robertson's business activities in Vermont. The notice directed Robertson to produce all relevant documents without any date restrictions or limitations. On March 30, 1994, Robertson filed a motion for a protective order under Rule 26(c),[4] arguing that the scope of Met Life's proposed areas of inquiry was overly broad, burdensome, and not limited to the relevant time period. Robertson requested that discovery be limited to matters concerning Robertson's business contacts with Vermont in 1993, the year the suit was filed. On April 20, 1994, the district court found Met Life's discovery request overbroad and issued a protective order requiring Met Life to limit the scope of its deposition to the years 1987 through 1993.

The parties filed memoranda on the personal jurisdiction question. According to Robertson, the acts and omissions alleged in Met Life's complaint occurred in St. Louis, Missouri; Houston, Texas; Dallas, Texas; and the building site in Miami, Florida. It is undisputed that none of the activities that served as the basis for Robertson's complaint took place in Vermont. Although the record is incomplete, it appears that Met Life filed suit in Vermont based on its belief that Vermont has a more favorable statute of limitations period than other available jurisdictions.[5] Thus, Met Life argues that the district court in Vermont has personal jurisdiction over Robertson on a theory of "general jurisdiction"—that is, Robertson's general business contacts with Vermont were sufficiently "continuous and systematic" to justify subjecting it to suit within the jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16 & n. 9, 104 S.Ct. 1868, 1872–73 & n. 9, 80 L.Ed.2d 404 (1984) (*"Helicopteros "*).

Based on its extensive discovery of Robertson's sales and employment records, Met Life claimed in its memorandum to the district court that Robertson had significant general business contacts with Vermont between 1987 and 1993, including: (1) nearly $4 million dollars in sales of its wall panel systems and other products between 1987 and 1993 and $226,319 in sales in 1993 alone to shipment addresses in Vermont;[6] (2) Robertson's relationship with five Vermont dealers of its "Star Building Systems" line of

---

**3.** The building, completed in 1981, was originally owned by a Texas developer. Met Life purchased it in 1984.

**4.** Fed.R.Civ.P. 26(c) provides in relevant part:

Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense....

**5.** Robertson argues that Met Life filed suit in Vermont because it believes that it can maintain its action under Vermont's six-year statute of limitations for general civil actions. VT. STAT. ANN. tit. 12, § 511. According to Robertson, however, even if the Vermont statute of limitations applies under the relevant choice-of-law rules, the appropriate statute is VT. STAT. ANN. tit. 9A, § 2–725—the Uniform Commercial Code statute of limitations in contracts for sale—which bars claims filed four years after the accrual of the action.

**6.** Sales figures for years prior to 1990 reflect the combined sales of Ceco Corp. and H.H. Robertson Corp., which merged in 1989 to form Robertson–Ceco.

products and its contracts with four Vermont building companies that were "authorized builders" for its "Ceco Building Systems" line of products; (3) the "support" offered by Robertson to Vermont dealers and builders in the form of engineering and product data manuals, "800" phone service, training video tapes, computer software, marketing materials, and the right to use company-owned trademarks; (4) national advertising in various catalogs and direct mail campaigns reaching Vermont, as well as direct marketing of Robertson products to at least three Vermont architectural firms; (5) the fact that Robertson is registered to do business in Vermont, has a Vermont sales identification number, and has filed Vermont income and sales tax returns; (6) visits to Vermont by at least eight of Robertson's sales employees and engineers on over 150 occasions between 1987 and 1993; and (7) the fact that a Robertson employee resided and maintained an office in Vermont between 1989 and 1990.

Robertson, on the other hand, argued that 1993—the year that Met Life filed its suit—was the only year relevant to the determination of personal jurisdiction. According to an affidavit submitted by Robertson's vice president and controller, John Sills, Vermont sales of Robertson's Star and Ceco product lines were less than .07% of Robertson's total sales in that year. Furthermore, it argued that the sale of Robertson products to Vermont businesses through independent contractors and dealers, occasional visits to Vermont by Robertson employees, and the fact that Robertson's national advertising campaigns may have reached Vermont, were not sufficient to establish general personal jurisdiction.

On July 29, 1994, the district court adopted Robertson's argument and granted its motion to dismiss based on the absence of personal jurisdiction. Met Life moved for reconsideration because the district court had erroneously stated that Met Life had not filed a memorandum in opposition to Robertson's motion. The district court subsequently issued an Amended Opinion and Order on August 5, 1994. It held that 1993 was the

relevant year for analyzing Robertson's contacts with Vermont. Noting what it deemed to be Robertson's limited Vermont sales and the fact that Robertson "maintained no office or agents in Vermont, owned no property in Vermont, and exercised no control over its independent dealers," the district court held that "[s]uch *de minimis* business contacts do not rise to the continuous and systematic level sufficient to justify assertion of general personal jurisdiction in this suit." Furthermore, applying the two-tiered test for personal jurisdiction set forth in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113–16, 107 S.Ct. 1026, 1032–34, 94 L.Ed.2d 92 (1987), it held that even if Met Life had shown that Robertson had continuous and systematic contacts with Vermont, jurisdiction would still be precluded on the ground that its exercise would be "neither fair nor reasonable" under governing case law: "[Vermont] [h]aving no interest in either the litigation or the parties, this Court concludes that the exercise of general jurisdiction over Robertson–Ceco would be improper." The court denied Met Life's motion for reconsideration of the amended order on September 16, 1994.

Met Life filed its notice of appeal on April 12, 1995, challenging the court's April 20, 1994, order limiting the scope of discovery on the personal jurisdiction question to the years 1987–93 and its August 5, 1994, amended order granting Robertson's motion to dismiss.[7]

## II. DISCUSSION

### A. The Legal Standards

 On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994). Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction. *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854, 111 S.Ct.

7. Robertson moved for entry of final judgment on October 14, 1994, but because United Dominion remained a party to the case at that time, the court denied its motion. Summary judgment was later granted in favor of United Dominion on March 14, 1995.

150, 112 L.Ed.2d 116 (1990). In contrast, when an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence. *Robinson,* 21 F.3d at 507 n. 3. In the instant case— where the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held—"the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Ball,* 902 F.2d at 197. Accordingly, for the purposes of our *de novo* review of the district court's dismissal of Met Life's suit for want of personal jurisdiction, we credit Met Life's averments of jurisdictional facts as true. *Id.*

## B. *Personal Jurisdiction*

 "[T]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (in banc); *see Savin v. Ranier,* 898 F.2d 304, 306 (2d Cir.1990). Thus, in resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process. *Savin,* 898 F.2d at 306.

 Courts have interpreted the relevant Vermont long-arm statute, VT. STAT. ANN. tit. 12, § 913(b),[8] as reflecting a "clear policy to assert jurisdiction over individual defendants

to the full extent permitted by the Due Process Clause." *Bechard v. Constanzo,* 810 F.Supp. 579, 582–83 (D.Vt.1992) (quoting *Northern Aircraft, Inc. v. Reed,* 154 Vt. 36, 40, 572 A.2d 1382 (1990)). Thus, for current purposes, the first part of our inquiry—the interpretation of the Vermont law governing service of process—merges with the second part of the jurisdictional test: whether the court's exercise of personal jurisdiction over the defendant satisfies the requirements of due process.

 The due process requirement for personal jurisdiction, enunciated by the Supreme Court in the seminal case of *International Shoe Company v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), protects a person without meaningful ties to the forum state from being subjected to binding judgments within its jurisdiction. By requiring "fair warning" that an individual's activities in a state may subject him to suit there, the Due Process Clause protects that person's liberty interest and "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (quotation marks omitted).

 The due process test for personal jurisdiction has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. The court must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction. *See International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158. For purposes of this initial inquiry, a distinction is made between "specific" jurisdiction and "general" jurisdiction. Specific jurisdiction exists when "a State exercises personal jurisdiction over a defendant in a

---

8. VT. STAT. ANN. tit. 12, § 913(b), the appropriate "long-arm" statute, provides:

Upon the service, and if it appears that the contact with the state by the party or the activity in the state by the party or the contact or activity imputable to him is sufficient to

support a personal judgment against him, the same proceedings may be had for a personal judgment against him as if the process or pleading had been served on him in the state. *See also Bechard v. Constanzo,* 810 F.Supp. 579, 582 & n. 2 (D.Vt.1992).

suit arising out of or related to the defendant's contacts with the forum"; a court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts. *Helicopteros,* 466 U.S. at 414–16 & nn. 8–9, 104 S.Ct. at 1872–73 & nn. 8–9. Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's "continuous and systematic general business contacts." *Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873; *see, e.g., Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 481 n. 3 (3d Cir.1993); *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 380–81 (9th Cir.1990), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Donatelli v. National Hockey League,* 893 F.2d 459, 462–63 (1st Cir.1990); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 374 (5th Cir.1987).

■■■ The second stage of the due process inquiry asks whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice"—that is, whether it is reasonable under the circumstances of the particular case. *See International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158. The Supreme Court has held that the court must evaluate the following factors as part of this "reasonableness" analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Asahi,* 480 U.S. at 113–14, 107 S.Ct. at 1032–33; *see also Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184–85; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 83 (2d Cir.1993) (discussing factors). While the exercise of jurisdiction is favored where the plaintiff has made a

threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185.

■■■ The two components of the due process inquiry are related inasmuch as both originated in the idea that a court cannot subject a person to its authority where the maintenance of the suit would offend "traditional notions of fair play and substantial justice." *See International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158 (discussing "fair play and substantial justice" in justifying minimum contacts stage of due process inquiry); *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184–85 (citing same passage to support "reasonableness" stage). Thus, in assessing whether it may exercise jurisdiction over a particular defendant, a court must weigh the relative strengths and weaknesses of each requirement—that is, depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry. *See Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184 (The application of the five-factor "reasonableness" test "may sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."). The First Circuit has articulated the interplay of these two components of the due process inquiry as follows:

A reviewing court must first examine the defendant's contacts with the forum. If the same do not exist in sufficient abundance, that is, if the constitutionally necessary first-tier minimum is lacking, the inquiry ends. If, however, the minimum exists, the criteria catalogued by the Court must be assessed in order to determine the constitutionality, in the particular circumstances, of an exercise of jurisdiction. At that stage, the criteria may work either to shrink the minimum contacts threshold (thus facilitating the asser-

tion of general jurisdiction) or to defeat general jurisdiction entirely.

*Donatelli*, 893 F.2d at 465 (citations omitted); *see also Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir.1994) ("We think … that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts]."); *Ellicott Mach. Corp. v. John Holland Party, Ltd.*, 995 F.2d 474, 479 (4th Cir.1993) (finding that insubstantial nature of defendant's minimum contacts with forum state required "a more concerned focus on the second prong of the due process analysis").

With this in mind, we proceed to the two stages of the due process inquiry.

### 1. Minimum Contacts

#### a. Period for Assessing Minimum Contacts

As a preliminary matter, the parties dispute the applicable time period for assessing a defendant's minimum contacts with the forum state. Met Life argues that the phrase "continuous and systematic" suggests an examination of the defendant's contacts over a period of several years before the filing of the lawsuit. Robertson, on the other hand, argues that minimum contacts should be assessed based on the defendant's contacts with the forum state *only* for the year in which the complaint was filed. Notwithstanding its earlier order permitting discovery on the question of Robertson's contacts between 1987 and 1993, the district court held that "Robertson–Ceco's contacts with Vermont must be analyzed during 1993, the year plaintiff filed the action."

Few cases discuss explicitly the appropriate time period for assessing whether a defendant's contacts with the forum state are sufficiently "continuous and systematic" for the purposes of general jurisdiction. However, our review of general jurisdiction cases reveals that contacts are commonly assessed over a period of years prior to the plaintiff's filing of the complaint. For example, in *Helicopteros*, 466 U.S. at 409–11, 104 S.Ct. at 1868–71, the Supreme Court examined the defendant's contacts with the forum state over a seven-year period to determine whether it met the "continuous and systematic" minimum contacts test. Likewise, other circuits have examined minimum contacts over a reasonable period of years in general jurisdiction cases, *see Wilson v. Belin*, 20 F.3d 644, 650–51 (5th Cir.) (examining defendant's contacts with forum state over five-year period in assessing minimum contacts for general jurisdiction purposes), *cert. denied,* — U.S. ——, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994); *Bearry*, 818 F.2d at 372, 376 (analyzing defendant's contacts with forum state over five-year period in general jurisdiction case); *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1329, 1330–31 (9th Cir.1984) (examining defendant's contacts over three-year period in connection with general jurisdiction inquiry). Finally, our own circuit has suggested in *dictum* that examining a defendant's contacts over a period of several years is appropriate when applying the "continuous and systematic" standard, *Braman v. Mary Hitchcock Memorial Hosp.*, 631 F.2d 6, 9 (2d Cir.1980) (implying that defendant's contacts with the forum state over five-year period relevant to minimum contacts inquiry).

 Because the phrase "continuous and systematic" necessarily requires that courts evaluate the defendant's contact with the forum state over time, we find that, while the district court reasonably provided for discovery for a six-year period (1987–93), it later erred in mechanically limiting its jurisdictional inquiry to the year 1993. The minimum contacts inquiry is fact-intensive, and the appropriate period for evaluating a defendant's contacts will vary in individual cases. In general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed—to assess whether they satisfy the "continuous

# 570

and systematic" standard.[9] The determination of what period is reasonable in the context of each case should be left to the court's discretion.

Inasmuch as the district court improperly limited its minimum contacts inquiry to the year 1993, we examine *de novo* Robertson's contacts with the state of Vermont between the years 1987 through 1993—the period the district court properly found to be reasonable for discovery purposes.

### b. Assessing Minimum Contacts

■■■■ The assessment of minimum contacts is fact-specific and must necessarily be tailored to the circumstances of each case. Met Life identifies roughly five categories of general business contacts between Robertson and Vermont during the period 1987–93 that it contends were sufficiently continuous and systematic to permit a Vermont court to exercise jurisdiction: (1) Sales: nearly $4 million dollars in sales of its wall panel systems and other products between 1989 and 1993 to Vermont addresses and Robertson's filing of Vermont income and sales tax returns during the relevant period; (2) Dealers: Robertson's relationship with five "independent" Vermont dealers of its "Star" line of products and its contracts with four Vermont building companies that were "authorized builders" for its "Ceco" line of products; (3) Product support: engineering and product data manuals, "800" phone service, training video tapes, computer software, marketing materials, and the right to use company-owned trademarks; (4) Advertising and marketing: national advertising in catalogs and direct mail campaigns that reach

Vermont and direct marketing to at least three Vermont architectural firms; and (5) Presence of Robertson employees in Vermont: visits by Robertson's employees and engineers to Vermont on more than 150 occasions between 1987 and 1993, and the fact that a Robertson employee resided and maintained an office in Vermont in 1989–90.

■■■ Met Life argues that the district court erred in finding that it failed to demonstrate Robertson's "continuous and systematic" contacts with the state of Vermont. It contends that although certain categories of contacts alleged by Met Life might be insufficient to establish minimum contacts when taken individually, *see, e.g., Sandstrom v. ChemLawn Corp.,* 904 F.2d 83, 89 (1st Cir. 1990) (mere license to do business and designation of agent for service of process within the forum state insufficient to confer general jurisdiction; "help-wanted" advertising—absent any product or service-related advertising—similarly insufficient); *Gates Learjet Corp. v. Jensen,* 743 F.2d at 1331 (mere solicitation of business through visits, telephone calls, and telexes to the forum state does not support general jurisdiction), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985), Robertson's business activities in Vermont, *when taken together,* are sufficient to establish general jurisdiction. We agree with Met Life that Robertson's various contacts with the forum state should not be examined separately or in isolation. There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts *as a whole.* We agree with the Fifth Circuit that

---

9. This rule is not inconsistent with *Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 52 (2d Cir. 1991), where we held that the court must consider a defendant's contacts with the forum state "at the time the lawsuit was filed" when deciding a motion to dismiss for lack of personal jurisdiction. In *Klinghoffer* the district court's exercise of jurisdiction over the Palestine Liberation Organization ("PLO") was premised upon evidence of certain fundraising and "proselytizing" activities antedating the 1987 passage of the Anti-Terrorism Act, 22 U.S.C. §§ 5201–5203 (1988) (the "ATA"), which made most PLO activity in the United States unlawful. Because two of the complaints against the PLO were filed in 1988, we remanded for additional factfinding on

whether the activities continued despite the ATA's passage and would therefore support personal jurisdiction over the PLO as to those complaints. In holding that a court must consider the defendant's contacts with the forum state at the time the lawsuit was filed, we neither stated nor implied that the jurisdictional inquiry was *limited* to the year the suit was filed. The other cases cited by Robertson are also distinguishable because they are specific jurisdiction cases where the "continuous and systematic" standard is simply not applicable. *See Lachman v. Bank of Louisiana in New Orleans,* 510 F.Supp. 753, 757–58 (N.D.Ohio 1981); *see also Connecticut Artcraft Corp. v. Smith,* 574 F.Supp. 626, 630 (D.Conn. 1983) (relying on *Lachman* ).

[d]etermining the existence of personal jurisdiction does not ... involve an examination of each of [the defendant's] contacts with [the forum state] viewed in isolation from one another. Rather we are required to examine [the defendant's] contacts *in toto* to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process.

*Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 779 (5th Cir.1986), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1892, 95 L.Ed.2d 499 (1987). This approach is more consistent with our view of the minimum contacts analysis as a contextual inquiry.

■ The two leading Supreme Court cases addressing what constitute "continuous and systematic" business operations provide a useful starting point for our analysis. In *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 445–46, 72 S.Ct. 413, 418–19, 96 L.Ed. 485 (1952), the Supreme Court first articulated the idea that a court may exercise personal jurisdiction over a foreign corporation based on general business operations within the forum state. The defendant (a Philippine mining corporation) was found to have met the standard where the general manager and president of the company moved his office to Ohio during the Japanese occupation of the Philippines during World War II, maintained records, held directors' meetings, and generally "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." *Id.* at 448, 72 S.Ct. at 419. In contrast, in *Helicopteros,* 466 U.S. at 411–12, 416, 104 S.Ct. at 1870–71, 1873, the Court found that the defendant Colombian corporation's general business contacts with Texas did not meet the minimum contacts standard where the defendant had purchased equipment from a company in the forum state, sent personnel to the forum state for training, and sent an officer of the corporation on a single trip to the forum for contract negotiations, but had never performed operations or solicited business within the state or sold any product that reached the forum state. The Court held that "mere purchases"—even at regular intervals—and the related brief presence of employees, did not rise to the level of "continuous and systematic general

business contacts" contemplated by the *Perkins* court. *Helicopteros,* 466 U.S. at 416–18, 104 S.Ct. at 1873–74.

Many cases, including this one, fall between *Perkins* and *Helicopteros.* On the one hand, unlike the defendant in *Perkins,* Robertson certainly did not use Vermont as a central office location for supervisory activities. On the other hand, unlike the defendant in *Helicopteros,* Robertson solicited business in Vermont and sold its products through Vermont dealers to Vermont customers. In support of its argument that the district court properly found that it lacked continuous and systematic contacts with Vermont, Robertson relies on three different cases—none of them binding on us or particularly persuasive. In the first of these, *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370 (5th Cir.1987), the Fifth Circuit reversed a district court's finding of general jurisdiction in a suit brought in Texas against an airplane manufacturer for a crash occurring in Mississippi, despite the fact that the defendant had $250 million in sales in Texas over a five-year period through seventeen different independent dealers. Robertson likens its contacts to those of the defendant in *Bearry,* drawing on the court's statement that "[the fact] that Beech products flow into Texas does not create a general presence in that state.... [D]istributors selling Beech manufactured products for their own account do not create minimum contacts sufficient to warrant general jurisdiction over Beech." *Id.* at 376. We find *Bearry* distinguishable, however, because the court's holding turned on the fact that all sales were carefully structured so that the negotiation, completion, and performance of all contracts occurred in Kansas, rather than Texas. Inasmuch as "[e]ach transaction was completed outside of Texas," *id.,* the Court of Appeals concluded that the mere flow of Beech products into the state did not constitute sufficiently substantial business contacts to satisfy the minimum contacts test. *See also Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1362 (5th Cir. 1990) ("A corporation's obvious intent to exercise its due process rights" by deliberately executing its contracts outside of the forum state "should not be disregarded lightly.")

(internal quotation marks omitted). Here, there is no suggestion that Robertson's Vermont sales were executed outside the state or that they were deliberately structured to avoid general jurisdiction in Vermont.

The other two cases on which Robertson relies are arguably closer to this case. In *Glater v. Eli Lilly & Co.*, 744 F.2d 213, 215, 217 (1st Cir.1984), the First Circuit found a defendant corporation's general business contacts too fragmentary to satisfy the constitutional standard for general jurisdiction where it advertised its pharmaceutical product in trade journals reaching the forum state and employed eight sales representatives to service physicians, pharmacies, and hospitals within the state. Similarly, in *Shute v. Carnival Cruise Lines*, 897 F.2d at 381, the Ninth Circuit found that the defendant cruise line, whose contacts with the forum state of Washington were limited to advertising in the local media, payment of commissions to travel agents, and sales of cruises to residents of the state, was not subject to the jurisdiction of Washington's courts. *See also Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240, 1242 (9th Cir.1984) ("[N]o court has ever held that the maintenance of even a substantial sales force within the state is a sufficient contact to assert jurisdiction in an unrelated cause of action.").

On the other hand, at least one other court of appeals—as well as a district court within our own circuit—has found contacts similar to those found here sufficient to satisfy the minimum contacts test. In *Provident National Bank v. California Federal Savings & Loan*, 819 F.2d 434, 436 (3d Cir.1987), the Third Circuit found continuous and systematic contacts between California Federal ("Cal Fed") and the state of Pennsylvania, where Cal Fed "maintained no Pennsylvania office, employees, agents, mailing address, or telephone number" and "had not applied to do business in Pennsylvania, did no advertising in Pennsylvania, and paid no taxes there." Indeed, the entire basis for the exercise of personal jurisdiction in that case was the fact that (1) a minuscule percentage of Cal Fed's depositors were Pennsylvania residents, contributing an equally small fraction of Cal Fed's total deposits; (2) three Pennsylvania

financial institutions "serviced" $10.2 million dollars worth of loans (loans not made in Pennsylvania) for Cal Fed—that is, the banks collected loan payments owed to Cal Fed in exchange for a fee; and (3) Cal Fed maintained a "controlled disbursement account" with a Pennsylvania bank under which Cal Fed would wire funds every business day sufficient to cover the total amount of checks cleared through the bank that day. *Id.* Because the handling of deposits and servicing of loans—however small the proportion of activities conducted on behalf of Pennsylvania customers might have been—were central to Cal Fed's activities and because Cal Fed's maintenance of the controlled disbursement account required Cal Fed to conduct "substantial, ongoing, and systematic activity in Pennsylvania," *id.* at 438, the court found that the minimum contacts component of the due process inquiry was satisfied. Furthermore, in *Sollinger v. Nasco International, Inc.*, 655 F.Supp. 1385 (D.Vt.1987), the court found that a defendant's mail order sales to Vermont residents satisfied the "continuous and systematic" standard:

> Through its catalogs, Nasco advertises and otherwise solicits business in Vermont. By mail and telephone Nasco sells its wares directly to Vermont residents. Nasco carries on in Vermont a " 'continuous and systematic, but limited, part of its general business....' " *Helicopteros Nacionales*, 466 U.S. at 415, 104 S.Ct. at 1872, quoting *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 438, 72 S.Ct. 413, 414, 96 L.Ed. 485 (1952). Although something less than the contacts described in *Helicopteros Nacionales* and *Perkins* may support an assertion of general jurisdiction over a foreign corporation, we find Nasco's contacts with Vermont to be continuous and systematic.

*Id.* at 1389 (internal quotation marks, alterations, and citations omitted).

The various approaches described above demonstrate that this is a close case. And while it is clear that Robertson's contacts do not rise to the level of those described in *Perkins*, we cannot agree with the district court's assessment of Robertson's Vermont contacts as "*de minimis.*" While it is true

that Robertson "owned no property in Vermont, and exercised no control over its independent dealers," the contacts it did have with the state were more than sporadic and occasional. While Robertson's $4 million dollars in sales in Vermont between 1987 and 1993, standing alone, may not have been sufficient, its relationship with dealers selling its products and its so-called "authorized" builders, the visits to those dealers and builders by Robertson personnel, the advertising and support available to Vermont residents regarding Robertson's products, and the deliberate targeting of Vermont architectural firms as sales prospects, tips the balance in Met Life's favor and leads us to conclude that it satisfied the "minimum contacts" requirement of the due process test.

## 2. The Reasonableness Factors

Once a plaintiff has demonstrated the requisite minimum contacts between the defendant and the forum state, a court is required to continue to the "reasonableness" stage of the inquiry and apply the five-factor test of *Asahi* to assess whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Asahi*, 480 U.S. at 113, 107 S.Ct. at 1033 (quotation marks omitted); *see A.I. Trade Fin.*, 989 F.2d at 83 ("Once minimum contacts have been established, the reasonableness of the exercise of jurisdiction must be determined by an evaluation of several factors including the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief.") (internal quotation marks omitted).[10]

■■ As our dissenting colleague points out, the Supreme Court has not had occasion to conduct the reasonableness inquiry in a general jurisdiction case—*Asahi* and *Burger King* were both specific jurisdiction cases. However, every circuit that has considered the question has held, implicitly or explicitly, that the reasonableness inquiry is applicable to *all* questions of personal jurisdiction, general or specific. In *Amoco*

*Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 n. 2 (9th Cir.1993), the Ninth Circuit noted that "[a]lthough neither the Supreme Court nor this circuit has explicitly engaged in a separate reasonableness inquiry in a general jurisdiction case, *Asahi*'s interpretation of *International Shoe* as entailing separate contacts and reasonableness inquiries is not limited to the specific jurisdiction context." *See Donatelli*, 893 F.2d at 465 (discussing application of minimum contacts and reasonableness analysis in general jurisdiction case); *Bearry*, 818 F.2d at 377 ("Even if [the defendant's] connections ... could be said to be continuous and systematic, we are persuaded that the exercise of general jurisdiction in this case would not be fair and reasonable."). Inasmuch as we see no basis for distinguishing between general jurisdiction and specific jurisdiction cases for the purposes of the reasonableness inquiry, and there is no indication that the Court intended to limit the inquiry to specific jurisdiction cases, we agree with other courts of appeals that it is appropriate in general jurisdiction cases.

The district court found that exercising general jurisdiction over Robertson in this case would be neither fair nor reasonable under the five-factor *Asahi* test:

Plaintiff, a non-resident suing on a cause of action that arose in Florida, has no interest in the lawsuit proceeding in Vermont. No witness or other evidence is located in Vermont, and defendant is a nonresident.... Florida, the locus of the alleged tort, and New York, plaintiff's domicile, have far more significant interests in resolving the dispute.

Having no interest in either the litigation or the parties, this court concludes that the exercise of general jurisdiction over Robertson–Ceco would be improper.

Our analysis leads to the same conclusion.

### a. Burden on the Defendant

■■ Certainly, there are many difficulties associated with requiring Robertson, a Dela-

**10.** Although in *A.I Trade Finance* we specifically referred to only three of the *Asahi* factors, we cited *Asahi* and indicated that those three factors were "includ[ed]" among the "several factors" that must be assessed in making the reasonableness determination. *A.I. Trade Fin.*, 989 F.2d at 83. Accordingly, our analysis below employs the full five-factor test.

ware corporation with its principal place of business in Pennsylvania, to defend this suit in Vermont. Significantly, none of its records, files, or witnesses with information about the litigation are located there. On the other hand, the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago. Thus, while we believe this factor cuts slightly in favor of the defendant in the instant case, we recognize that, taken alone, it falls short of overcoming the plaintiff's threshold showing of minimum contacts.

### b. Interests of the Forum

■ We find that the dispute between Met Life and Robertson implicates absolutely no interest of the State of Vermont. The acts and omissions that serve as the basis for Met Life's suit occurred in Texas, Missouri, and Florida. Furthermore, unlike cases in which the forum state has an arguable interest in providing redress to its own citizens for injuries occurring outside of its jurisdiction, see *Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir.1995); *Grand Entertainment*, 988 F.2d at 483; *Interfirst Bank Clifton v. Fernandez*, 844 F.2d 279, 285 (5th Cir.1988), plaintiff Met Life is both incorporated in and has its principal place of business in New York. To the extent that Robertson's business contacts with Vermont might give the state a general interest in disputes concerning its products, we agree with the Fifth Circuit:

> The concerns that injuries might occur in the state or might somehow implicate [citizens of the forum state] are adequately protected. [The defendant] is subject to *the specific jurisdiction [of forum state] courts* when its product causes injuries or when it breaches a contract [in the forum state].

*Bearry*, 818 F.2d at 377 (emphasis added). Accordingly, we believe this factor weighs heavily against the reasonableness of the court's exercise of general jurisdiction over Robertson.

### c. Interests of the Plaintiff in Obtaining Convenient and Effective Relief

■ For similar reasons, we fail to see how the plaintiff's interests in proceeding in a convenient forum would be served by subjecting the defendant to suit in Vermont. Met Life is not a Vermont citizen and it has not identified any witnesses or other evidence more convenient to that forum. It appears that Met Life's only interest in litigating in Vermont stems from its belief that the forum may offer a more generous statute of limitations—and indeed, may be the only jurisdiction in which Met Life's suit is not barred. If we thought this consideration relevant, this factor might weigh in favor of the exercise of jurisdiction, in the sense that Vermont could be the only jurisdiction that serves the interest of the plaintiff in obtaining *effective* relief. However, such questions are not permissible considerations in the context of a jurisdictional inquiry. As the Supreme Court stated in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 778, 104 S.Ct. 1473, 1480, 79 L.Ed.2d 790 (1984): "The question of the applicability of [the forum state's] statute of limitations ... presents itself in the course of litigation only after jurisdiction over respondent is established, and we do not think that such choice of law concerns should complicate or distort the jurisdictional inquiry." There the Court declined to accept the defendant's argument that permitting the plaintiff's suit to proceed in the only forum where the statute of limitations had not yet run would be fundamentally unfair. If choice-of-law considerations cannot be invoked by the defendant to demonstrate the unreasonableness of exercising jurisdiction, they likewise should not complicate our analysis of the plaintiff's interests in proceeding in Vermont.

### d. Efficient Administration of Justice

■ In evaluating this factor, courts generally consider where witnesses and evidence are likely to be located. *See Caruth*, 59 F.3d at 129; *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1552 (11th Cir.), *cert. denied*, 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993). As the district court well noted, "[n]o witness or other evidence is located in Vermont, and defendant is a nonresident.... Florida, the locus of the alleged tort, and New York, plaintiff's domicile, have far more significant interests in resolv-

ing the dispute." This factor strongly favors Robertson.

### e. Policy Arguments

This factor requires us to consider the common interests of the several states in promoting substantive social policies. Met Life has not suggested, much less shown, any substantive social policies that would be furthered by permitting this case to be heard in Vermont, and we can imagine none. This factor does not favor either party in our assessment of the reasonableness criteria.

\* \* \* \* \*

Reviewing the results of our "reasonableness" inquiry, we note that the first factor tips the scale slightly against the exercise of jurisdiction, while the second, third, and fourth factors weigh heavily against it. In the circumstances thus presented it seems clear to us that the district court correctly concluded that subjecting Robertson to suit in Vermont would be contrary to "traditional notions of fair play and substantial justice," and properly dismissed the suit for want of personal jurisdiction.

 In affirming the judgment of the district court, we are mindful of the Supreme Court's admonition in *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184, that dismissals resulting from the application of the reasonableness test should be few and far between:

> [W]here a defendant who purposefully has directed his activities at forum residents [or has established minimum contacts] seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

This case presents the kind of exceptional situation envisaged by the Court in *Burger King:* here the existence of minimum contacts between the defendant and the forum state presents an arguably close question, but the analysis of the *Asahi* factors reveals that the exercise of personal jurisdiction would be decidedly unreasonable. Such cases may be unusual, but they remain good candidates for dismissal. *See Ticketmaster,* 26 F.3d at 210; *Ellicott Mach. Corp.,* 995 F.2d at 479. It is true, of course, that in certain cases, many of the inconveniences created by subjecting a nonresident defendant to the court's jurisdiction can be cured by a change of venue under 28 U.S.C. § 1404(a),[11] *see Burger King,* 471 U.S. at 477 & n. 20, 105 S.Ct. at 2184 & n. 20; *Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 701 (3d Cir. 1990); *Corporate Inv. Business Brokers v. Melcher,* 824 F.2d 786, 790–91 (9th Cir.1987), but it is also the case that issues of convenience pertinent to a § 1404 motion and the related common law concept of *forum non conveniens* should not be conflated with the due process concerns that are the focus of the *Asahi* test. *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 150 (1st Cir.1995); *Villar v. Crowley Maritime Corp.,* 990 F.2d 1489, 1501 (5th Cir.1993) (Johnson, J., concurring in part), *cert. denied,* —— U.S. ——, 114 S.Ct. 690, 126 L.Ed.2d 658 (1994). The present case is not one in which subjecting Robertson to jurisdiction in Vermont would merely be inconvenient; Met Life's interest in pursuing its action in Vermont and Vermont's interest in adjudicating the case are so attenuated, if not nonexistent, that the exercise of personal jurisdiction would violate our basic sense of "fair play and substantial justice"—and deprive the defendants of the due process guaranteed by the Constitution.

### C. *Scope of Discovery*

 As a final issue, Met Life challenges the district court's decision to limit the scope of its discovery of Robertson's Vermont contacts to the years 1987 through 1993. The district court's protective order can be reversed only if Met Life demonstrates that the court abused its discretion. *In re American Tobacco Co.,* 880 F.2d 1520, 1530 (2d Cir.1989).

As discussed above, *see supra* p. 569, the court's order limiting discovery to a six-year period prior to the commencement of the suit

---

11. 28 U.S.C. § 1404(a) provides:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

was entirely appropriate; its error was in limiting its own inquiry into Robertson's contacts with the state of Vermont to the year 1993, rather than considering its contacts over the entire discovery period (1987–93). Met Life conducted substantial discovery, deposed numerous Robertson employees and had access to six years of sales and employment records. Allowing discovery of Robertson's contacts over an unlimited time period, as requested by Met Life, would have been overly broad and unquestionably burdensome for Robertson. We find no abuse of discretion.

### III. CONCLUSION

To summarize:

#### 1. Scope of Discovery

The district court did not abuse its discretion in limiting Met Life's discovery of Robertson's Vermont contacts to the years 1987–93.

#### 2. Minimum Contacts

a. In general jurisdiction cases district courts should examine a defendant's general business contacts with the forum state over a period that is reasonable in the context of the case presented. We find that the district court erred in limiting its jurisdictional inquiry regarding Robertson's Vermont contacts to the year 1993.

b. We disagree with the district court's conclusion that, in the circumstances presented, Met Life failed to satisfy its burden of demonstrating that Robertson had "continuous and systematic" general business contacts with the state of Vermont. Robertson's $4 million dollars in sales in Vermont, its relationship with dealers and "authorized builders" selling its products in Vermont, its advertising in Vermont, its deliberate targeting of Vermont architectural firms as sales prospects, and the repeated visits to Vermont by Robertson personnel, were sufficient to satisfy that standard.

#### 3. Reasonableness

We find the five-factor "reasonableness" inquiry set forth in *Asahi Metal Industry Co.*

*v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987), to be applicable to general jurisdiction cases. Applying that test to the present case, we affirm the district court's conclusion that, in the absence of any cognizable interest on the part of the plaintiff or the State of Vermont in adjudicating these claims in Vermont, the exercise of jurisdiction in these circumstances would violate traditional notions of fair play and substantial justice.

Accordingly, we affirm the district court's order limiting Met Life's discovery of Robertson's contacts with Vermont to the years 1987–93 and its order dismissing Met Life's suit against Robertson for lack of personal jurisdiction.

WALKER, Circuit Judge, dissenting:

The majority's adoption of a bifurcated personal jurisdiction test, which extends to the general jurisdiction context the Supreme Court's holdings in the specific jurisdiction cases of *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), and our holding in *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir.1993), erodes the doctrinal foundation established in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Shortly after the decision in *International Shoe*, the Supreme Court decided *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), which established the doctrine of forum non conveniens whereby a court may dismiss or transfer a case because a forum is inconvenient notwithstanding that the court has in personam jurisdiction over the defendant. It is the doctrine of forum non conveniens that should govern whether this suit stays in Vermont, not the doctrine of general personal jurisdiction. Because the majority brushes aside the central tenet of jurisdictional due process established in *International Shoe* by allowing the interests of the plaintiff and of the forum to displace the liberty interests of the defendant, I respectfully dissent.

The modern constitutional due process standard for the exercise of personal jurisdiction over a non-present defendant was first pronounced in *International Shoe.* That a court must have personal jurisdiction flows from the Due Process Clause of the Fifth Amendment, which "requires only that ... a defendant ... have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158 (citation omitted). The Supreme Court's opinion in *International Shoe,* which implicated only the interests of the defendant and not the interests of the plaintiff or of the forum state, made it clear that whether due process is satisfied turns exclusively on the fairness to the defendant in being made to defend a suit in a particular forum.

The majority's holding is, in part, an accommodation of the Supreme Court's more recent jurisprudence which reconfigures the jurisdictional underpinning of *International Shoe.* Thirty-five years after the Supreme Court hailed "minimum contacts" as the constitutional touchstone of the due process analysis, it espoused, albeit in dicta, an additional due process consideration concerning the protection of interstate federalism. *World–Wide Volkswagen,* 444 U.S. at 292–93, 100 S.Ct. at 564–65. This supplemental function of due process is the precursor to the majority's "reasonableness" inquiry in the present case. Only two years later, however, in *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), the Supreme Court reaffirmed its earlier course, recognizing that the personal jurisdiction requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty," *id.* at 702, 102 S.Ct. at 2104 (footnote omitted), and explaining that "[t]he restriction on state sovereign power described in *World–Wide Volkswagen Corp.* ... must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause," *id.* at 702–03 n. 10, 102 S.Ct. at 2105 n. 10. In spite of this reassertion, in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–77, 105 S.Ct. 2174, 2184–85, 85 L.Ed.2d 528

(1985), and later in *Asahi,* 480 U.S. at 113–15, 107 S.Ct. at 1032–34, the Supreme Court doubled-back to its holding in *World–Wide Volkswagen* by defining the test for specific jurisdiction to include both a "minimum contacts" and a "reasonableness" component. In other words, the concept of "traditional notions of fair play and substantive justice," which was defined in *International Shoe* only by the "contacts" of the defendant with the forum state, has been transformed into the notion of reasonableness apart from the contacts.

In the wake of *Burger King* and *Asahi,* we are bound to adhere to the Supreme Court's adoption of a reasonableness inquiry in the specific jurisdiction context. In the general jurisdiction context, however, we are not so bound. I believe that the Supreme Court's silence (except arguably in dicta) regarding the application of a reasonableness test in the general jurisdiction context should not be construed as evidencing the Court's desire to erode the half-century-old doctrine of *International Shoe.* The majority's holding today requires courts to consider interests beyond the defendant's interests, which are the only interests that require consideration under *International Shoe.* Unless and until the Supreme Court instructs us in a general jurisdiction case that interests other than those of the defendant are implicated by due process in the personal jurisdiction analysis, we should not rush to make them so. I believe that these ancillary interests, which have nothing to do with whether it is fair and just for a foreign defendant to be haled into an out-of-state court, are properly accounted for under the doctrine of forum non conveniens.

The fact that other circuits have chosen the course embarked on by the majority, if anything, reinforces my concerns. The sprouting like weeds of multi-pronged tests for the reasonableness inquiry in the circuits in both specific and general jurisdiction cases has left this legal garden in disarray. *See, e.g., Amoco Egypt Oil Co. v. Leonis Navigation Co.,* 1 F.3d 848, 851–53 (9th Cir.1993) (bifurcated test that employs seven-factor reasonableness inquiry); *Gould v. P.T. Krakatau Steel,* 957 F.2d 573, 576 (8th Cir.) (unequally weighted five-factor balancing

test), *cert. denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Theunissen v. Matthews,* 935 F.2d 1454, 1460–61 (6th Cir. 1991) (three-pronged balancing test in which third factor contains a five-factor sub-balancing test for reasonableness); *Donatelli v. National Hockey League,* 893 F.2d 459, 465 (1st Cir.1990) (two-tiered test in which second tier, which considers "Gestalt" factors measuring reasonableness, is not reached absent minimum contacts); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370 (5th Cir.1987) (bifurcated test that includes four-factor reasonableness evaluation). That the reasonableness test is inherently discretionary cannot be disputed, and from today forward, in this circuit there can be no certainty for the practitioner as to the presence or absence of personal jurisdiction over the out-of-state defendant until the matter is litigated.

Although I agree that this case is not one properly tried in Vermont, I believe that this issue is suitably resolved on a motion for dismissal or removal under forum non conveniens rather than as a matter of in personam jurisdiction. Accordingly, I respectfully dissent.