**CREATIVE SOCIO–MEDICS, CORP., Plaintiff,**

v.

**The CITY OF RICHMOND, Defendant.**

**Civil Action No. 00–CV–6690.**

United States District Court, E.D. New York.

Aug. 21, 2002.

Martin S. Siegel, Berlack, Israels & Liberman LLP, New York, NY, for plaintiff.

Timothy J. Dennin, New York, NY, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff, Creative Socio–Medics Corp. ("CSM"), initially commenced an action against defendant, the City of Richmond, Virginia ("Richmond"), alleging breach of contract in the Supreme Court, State of New York, Suffolk County by filing a summons on July 19, 2000. On November 8, 2001, pursuant to 28 U.S.C. § 1331(a)(2) and (c)(1), defendant removed the state court action to this court. On November 20, 2000, Richmond filed and served a motion for judgment against CSM alleging, among other things, breach of contract in Virginia.[1] By stipulation, Richmond stayed the action in Virginia until resolution of the motion now before this court.

Defendant moves to dismiss plaintiff's complaint pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure ("FRCP") for lack of in personam jurisdiction and pursuant to Rule 12(b)(3) of the FRCP on the basis of improper venue or, in the alternative, to transfer to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a).

### Background

Plaintiff CSM is a corporation organized under the laws of the State of Delaware with its principal place of business in New York. See Compl. ¶ 1. CSM is engaged in the consulting business, providing software packages, training services, and ongoing technical support to those who purchased the software. See id. Defendant Richmond is a municipal corporation of the Commonwealth of Virginia. See id. ¶ 2. Richmond does not own, use or possess any real or tangible property located in New York. See Siegel Aff. Ex. 24. Richmond has escrow accounts with the Bank of New York but they relate to debt service on various bond issues. See id.

In November 1997, Richmond sought a vendor "to submit proposals for providing software packages, implementation and training services, and ongoing technical support for various functional areas" for the City of Richmond's agencies by issuing a Human Services Automation Request for Proposal No. 8C075 (the "RFP") specifying the details and scope of the project. See Dennin Aff. Ex. A. Richmond invited CSM to submit its bid by mailing a copy of the RFP to CSM in New York. See Siegel Aff. Ex. 24. Richmond normally sends out requests for proposal to companies that have asked to be on a bid list or companies in the business for sought products or services that Richmond is aware of. See id. Ex. 29.

On December 17, 1997, CSM submitted a Propsal for a Human Services Information System (the "Proposal") in response to Richmond's RFP. See Dennin Aff. Ex. B. In its response, CSM attached its standard long form license and service agreement. See Siegel Aff. Ex. 1. After CSM submitted the Proposal, Richmond invited James Gargiulo, the vice-president of sales and marketing of CSM, to demonstrate CSM's base-line software. See id. On February 4, 1998, CSM came to a meeting in Richmond to demonstrate the software

---

**1.** It is unclear in which court in Virginia this action was filed.

and answer any questions that Richmond had about the Proposal. *See* Dennin Aff. Ex. D.

Subsequent to the demonstration, Richmond accepted CSM's Proposal and sent its standard form of services contract to New York. *See* Siegel Aff. Ex. 2. The negotiations relating to the terms of the contract were not extensive. *See id.* The principal negotiations related to pricing and the schedules attached to the contract, one of which was the software licensing agreement. *See id.* All the contract schedules, including the software license agreement, were prepared by CSM in New York and, with the exception of a March 2, 1998 meeting in Virginia, were negotiated by telephone and mail communications between CSM personnel in New York and Richmond personnel in Richmond, Virginia. *See* Dennin Aff. Ex. D. The purpose of the March 2, 1998 meeting was to discuss pricing and payment terms, and to determine the nature and number of licenses to be acquired by Richmond. *See id.*

On May 26, 1998, CSM and Richmond entered into a five year services contract and a software license agreement, attached to the contract as Schedule 1 (collectively the "Agreement"). *See* Dennin Aff. Ex. C; Siegel Affid. Exh. 1. The Agreement was executed by CSM in New York and by Richmond in Richmond, although it is unclear which party was the last to sign the Agreement. *See* Dennin Aff. Ex. C. Pursuant to the software license agreement, CSM granted Richmond a non-exclusive, non-transferable license to use one copy of the licensed software. *See id.* Schedule 2(g) of the contract outlines the following charges for products and services provided by CSM pursuant to the Agreement: (1) $472,000 for licensed CSM programs; (2) development payment in the amount of $62,900; (3) $181,980 for installation services; (4) $8,000 for travel and living expenses; (5) $30,729 per quarter for support services provided in connection with CSM programs and $31,225 per year for support services in connection with third party software; and (6) $850–$1,000 per day, CSM's then current daily rate, for additional services. *See id.* In addition, schedule 2(b) lists charges for two third-party programs totaling $197,700 with an option to purchase additional users for $375 per user. *See id.*

CSM used third-party vendors on the project. It hired the Olson Group ("Olson"), a company located in Washington State, as a subcontractor in connection with development of the not-for-profit portion of the financial software. *See id.* Ex. 4. Olson was retained to license its software to provide an interactive interface between the Great Plains financial software and CSM's software. *See id.* The Great Plains interface was designed to share information between CSM Human Services Information System ("HSIS") products and the Great Plains financial application for the purpose of producing checks based upon the information sent from the CSM HSIS products. *See id.* Ex. 28. The CSM side of the Great Plains interface was written by CSM employees in its California office and then installed onto a machine in New York over a modem line using communications software. *See id.* After Olson's software was loaded onto the CSM hardware in New York, the interfaces between the various software products were tested in New York, then finally the software was loaded onto Richmond's computer. *See id.*

CSM also retained SolTech Group ("SolTech") and Hi–Tech International Inc. ("Hi–Tech"), two companies located in Virginia, as subcontractors. SolTech performed services related to Great Plains and Olson software, including installation, training, and software specification docu-

mentation. *See* Dennin Aff. Ex. D. Hi-Tech was CSM's "implementation arm" for the project, performing training and project management with guidance from New York. *See* Siegel Aff. Ex. 27.

Between approximately June 1998 and April 2000, CSM provided software products and consulting services such as: implementation, customization, training, and ongoing technical support to Richmond. *See* Compl. ¶ 6. The CSM software licensed to Richmond was an "off the shelf" product developed by CSM in New York. *See* Siegel Aff. Ex. 3. The actual installation of the software took little more than one day. *See id.* However, CSM spent approximately 3,000 hours in New York customizing its software at the request of Richmond. *See id.* After the customizations were developed, they were tested on CSM computers in New York and then electronically transmitted to Richmond's computer in Virginia. *See id.* CSM prepared and verified a scope document detailing all the tasks to be performed by CSM, status reports, screen layouts, quality testing, address interface testing, designed the interface, performed data conversion, and project management in New York. *See id.* CSM also trained Hi-Tech on certain aspects of the project in New York and provided training to Richmond personnel in person in Richmond, via telephone, and by computer-to-computer connection. *See id.* In addition, CSM set up a Richmond group on its website as an alternative way for Richmond and CSM personnel to communicate directly. *See id.* Ex. 30.

Furthermore, there were numerous in-person meetings between CSM and Richmond personnel in relation to the project.

Richmond claims that there were approximately fifty or more days in which CSM traveled to Richmond to attend meetings before and after the execution of the contract. *See* Dennin Aff. Ex. H; Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def.'s Mem.") at 13. CSM disputes that number by pointing out that there were twenty-eight distinct visits because many of the visits were multiple-day trips or were made by more than one CSM employee. *See* Siegel Aff. Ex. 3. On September 22, 1998, four of Richmond's personnel came to CSM's office in New York for a meeting to discuss the Agreement and services to be provided. *See id.;* Ex. 24. In August and November 1998, Jeanine Carroll, Richmond's project manager, visited CSM's offices in New York and discussed the project.[2] *See id.* Ex. 3.

Subsequent to the execution of the Agreement, at Richmond's request, CSM performed services that allegedly went beyond the scope of the Agreement. *See id.* ¶ 7. CSM also alleges that Richmond agreed to pay CSM for these additional services as well as the services previously performed by CSM that were within the scope of the Agreement. *See id.* By letter dated April 12, 2000, Richmond purported to terminate the Agreement pursuant to Article IV, paragraph 4.1 of the Agreement because, as Richmond alleges, CSM failed to meet any of the deadlines specified in the Agreement. *See id.* ¶ 8. By letter dated May 1, 2000, CSM acknowledged Richmond's termination of the Agreement and attached a summary detailing all outstanding fees allegedly owed by Richmond in the total amount of $1,052,049.68. *See id.* ¶ 9. Richmond has

---

**2.** The parties dispute the nature of Carroll's visit to New York. According to Richmond, the purpose of Carroll's trips to New York was to visit her family and those trips were not authorized or requested by Richmond. *See* Dennin Aff. Ex. F. However, Carroll admitted that she considered visits to CSM offices helpful and beneficial to her duties at Richmond. *See id.*

not paid any part of this amount. *See id.* ¶ 10.

CSM's software is now located on CSM's NT server computer system in New York and Richmond's Unix server in Virginia. *See* Dennin Aff. Ex. D, O. CSM made modifications to the HSIS system. *See* Siegel Aff. Ex. 27. Copies of the Great Plains and Olson software were installed in New York and are also contained in Richmond's NT server. *See id.;* Dennin Aff. Ex. D. There were "superficial" changes not affecting the data exchange of the interface made to the Great Plains software. *See* Siegel Aff. Ex. 27. A copy of the Great Plains software modified by Sol-Tech was never loaded onto CSM's computer. *See id.* CSM had the ability to connect to both Richmond's NT server for the Great Plains software as well as the UNIX server for CSM's product.

## Discussion

### (1)

▮ Defendant moves under Rule 12(b)(2) to dismiss the complaint against it for lack of personal jurisdiction. To determine personal jurisdiction federal courts look to the law of the state where the court sits. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996). New York's long arm statute, N.Y. C.P.L.R. § 302(a) provides, in pertinent part:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

(1) transacts any business within the state . . .

N.Y. C.P.L.R. § 302(a)(1) (McKinney Supp.1999).

▮ In order to obtain jurisdiction under § 302(a)(1), "the following conditions must be met: (1) the defendant must transact business in the state; and (2) the cause of action must be directly related to, and arise from, the business so transacted." *Reyes v. Sanchez–Pena,* 191 Misc.2d 600, 742 N.Y.S.2d 513, 524 (N.Y.Sup.Ct. 2002) (citing *Storch v. Vigneau,* 162 A.D.2d 241, 556 N.Y.S.2d 342 (1st Dep't 1990)). Under New York law, "[t]he 'transacting business' prerequisite is satisfied if it is shown that the non-domiciliary 'purposefully avail[ed] itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.'" *McLenithan v. Bennington Cmty. Health Plan,* 223 A.D.2d 777, 778, 635 N.Y.S.2d 812, 813 (3d Dep't 1996) (quoting *McKee Elec. Co. v. Rauland–Borg Corp.,* 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 37–38, 229 N.E.2d 604 (1967)). The "arises from" prong is satisfied if there is a strong nexus between the plaintiff's cause of action and the defendant's in-state conduct. *See Launer v. Buena Vista Winery, Inc.,* 916 F.Supp. 204, 208 (E.D.N.Y.1996). "[A] single transaction in New York out of which the cause of action has arisen may satisfy the transaction of business provision." *Reyes,* 742 N.Y.S.2d at 523 (citing *Singer v. Walker,* 15 N.Y.2d 443, 456–457, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68 (1965)).

▮ In determining whether an out-of-state defendant "transacts business" in New York, the Second Circuit, interpreting New York state law, has adopted an approach that considers a number of factors, such as (1) whether the defendant has an on-going contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract requires notices and payments to be

sent into the forum state or requires supervision by the corporation in the forum state. *See Agency Rent A Car Sys., Inc.,* 98 F.3d at 29. The courts may consider other factors and are to examine the totality of circumstances. *See id.*

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden to make a *prima facie* showing that the court has jurisdiction over the defendant. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996). In this case, where the parties have conducted discovery regarding Richmond's contacts with the forum state, but no evidentiary hearing has been held, "[CSM's] *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over [Richmond]." *Id.* at 567 (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990)(quotations omitted)).

Defendant argues that there is no personal jurisdiction over Richmond in this district because (1) the meetings regarding contract negotiations were held in Virginia and Richmond executed the contract in Virginia; (2) the contract contains a Virginia choice of law clause; (3)the contract required that it be performed in Richmond, Virginia; (4)the contract did not require payments to be forwarded to New York; and (5) the City of Richmond was not physically present in New York.

While Richmond does not address the issue of whether it had an on-going contractual relationship with CSM, the review of facts averred by CSM clearly indicates that the contract contemplated and resulted in a continuing relationship between the parties. New York courts employ a prospective analysis in determining whether an ongoing contractual relationship exists between the parties. *See Schomann Int'l Corp. v. Northern Wireless, Ltd.,* 35 F.Supp.2d 205, 209 (N.D.N.Y.1999) (citing *George Reiner & Co. v. Schwartz,* 41 N.Y.2d 648, 653, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977)) (four-year employment contract "contemplated and resulted in a continuing relationship between [the parties]"); *China Express, Inc. v. Volpi & Son Machine Corp.,* 126 A.D.2d 239, 245, 513 N.Y.S.2d 388, 392 (1st Dep't 1987) (noting that the installation and monitoring of restaurant equipment in Arizona "manifestly contemplated an ongoing relationship between the parties"); *Roman v. Sunshine Ranchettes, Inc.,* 98 A.D.2d 744, 744, 469 N.Y.S.2d 449, 450 (2d Dep't 1983).

The Agreement provided that it would commence on June 15, 1998 and terminate on June 14, 2003. *See* Dennin Aff. Ex. C. Thus, when viewed prospectively, the contract between CSM and Richmond contemplated a continuing relationship. It is clear that licensing, installation, training, and development of the software products would occur over an extended period of time and would require continuing contact between the parties. It is difficult to believe that Richmond, while purchasing an off-the-shelf software for various functional areas of its agencies, did not anticipate that, in order to satisfy the different needs of its agencies, the off-the-shelf product would require extensive customization which would, of necessity, had to be performed in New York. Accordingly, Richmond had an on-going contractual relationship with a New York corporation that should have been foreseen at the time the parties entered into the contract.

Richmond's contention that the meetings regarding contract negotiations were held in Virginia and that it executed the contract in Virginia is undisputed.[3] CSM con-

---

**3.** However, there is a discrepancy as to the number of meetings regarding contract nego-

cedes that, with the exception of March 2, 1998 meeting in Virginia, the Agreement was negotiated by telephone and mail communications between CSM personnel in New York and Richmond personnel in Virginia. *See* Dennin Aff. Ex. D.

The law in the Second Circuit is clear that "one need not be physically present in order to be subject to the jurisdiction of our courts under CPLR 302 for, particularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in the State." *Launer,* 916 F.Supp. at 210 (E.D.N.Y.1996) (quoting *Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970)); *see also Agency Rent A Car Sys., Inc.,* 98 F.3d at 31 ("[W]e question whether, in an age of e-mail and teleconferencing, the absence of actual personal visits to the forum is any longer of critical consequence."); *Liberatore v. Calvino,* 293 A.D.2d 217, 742 N.Y.S.2d 291, 293 (1st Dep't 2002) (telephone calls and written communications may provide a sufficient basis for personal jurisdiction under the long-arm statute where they have been used by the defendant to actively participate in business transactions in New York.)

It is undisputed that CSM and Richmond negotiated the contract by telephone and e-mail communications. It is also undisputed that CSM executed the contract in New York, while Richmond executed the contract in Virginia. There is no suggestion in this record that the parties conducted their business this way for reasons

other than convenience. "Indeed, given the benefits of modern technology and time and expense associated with interstate travel, physical presence of the parties in the same room may no longer be required in order to execute a contract." *Schomann Int'l Corp. v. Northern Wireless, Ltd.,* 35 F.Supp.2d at 210.

▋ It is also undisputed, as Richmond points out, that the Agreement provides that it is governed by the laws, rules and regulations of the Commonwealth of Virginia. *See* Dennin Aff. Ex. C. However, Richmond's reliance on the choice of law provision is misplaced. "Choice of law questions are significantly different from questions of jurisdiction." *Alan Lupton Assocs., Inc. v. Northeast Plastics, Inc.,* 105 A.D.2d 3, 8, 482 N.Y.S.2d 647, 651 (4th Dep't 1984). Choice of law provisions, as opposed to forum selection clauses, "have minimal jurisdictional implications." *Id.* Indeed, considering Richmond's status as a Virginia municipality, the presence of a choice of law clause in the contract, while there is an absence of a forum selection clause in this case is telling. Thus, CSM may acquire personal jurisdiction over Richmond even though the law of the state of Virginia may have to be applied.

Whether the contract required that it be performed in Richmond, Virginia is an issue on which there is the most disagreement between the parties. Richmond argues that the services, such as initial software installation, project management, and training, rendered by CSM and its subcontractors were performed on-site in

---

tiations held in Virginia. Richmond does not provide the exact number but contends that "there were approximately 50 days in which CSM traveled to Richmond to attend meetings both before and after the execution of the contract." Def.'s Mem. at 13. CSM claims that there was only the March 2, 1998 meeting relating to contract negotiations that took place in Virginia and that the rest of the trips

related to services performed under the contract. *See* Dennin Aff. Ex. D. Richmond's personnel came to New York once to discuss the Agreement and services to be provided. *See* Siegel Aff. Ex. 3, 24. In addition, Carroll visited CSM's offices on two occasions while she was in New York on personal matters. *See id.* Ex. 3.

Virginia. CSM replies by pointing out that, with the exception of software installation, which took little more than one day, and some training, it spent thousands of hours in New York developing and customizing the software, preparing and verifying the scope document, developing additional software, screen layouts, quality assurance testing, and address interface testing.

"Although as a general rule the activity of a plaintiff within the forum pursuant to the contract does not confer jurisdiction," *Geller Media Management, Inc., v. Beaudreault,* 910 F.Supp. 135, 138 (S.D.N.Y. 1996), the RFP and the Agreement make it clear that Richmond's purpose in entering into the contract was to not only find a vendor that would provide implementation, training services, and licensing of software products, but also ongoing technical support. While it is true that CSM performed installation and conducted training in Richmond, it is also true that CSM was to provide support services to Richmond for six years. *See* Dennin Aff. Ex. C. A comparison of costs for products and services listed in schedule 2(g) to the contract suggests that this contract was not about installation and training. While the schedule provided for $181,980 as a payment for installation services, CSM charged Richmond $472,700 for licensed programs and were to bill Richmond $30,729 per quarter for support services in connection with CSM programs and $31,225 per year for support services in connection with third-party software over a six-year period. The price for installation and training services constituted only eleven percent of the contract price. Also, CSM did, in fact, spend approximately 3,000 hours in New York customizing its software per Richmond's request.[4] *See* Siegel Aff. Ex. 3.

Thus, plaintiff correctly points out that installation and training services were incidental to the licensing, development and support services provided in New York by CSM for the benefit of Richmond. *See Corporate Campaign, Inc. v. Local 7837, United Paperworkers Int'l Union,* 265 A.D.2d 274, 275, 697 N.Y.S.2d 37, 39 (1st Dep't 1999) (where "defendant requested performance of plaintiff's New York activities for defendant's benefit, and were intimately involved in the implementation of plaintiff's campaign, plaintiff's work on defendant's behalf may be attributed to defendant for jurisdictional purposes.")

Defendant's argument that the contract did not require payments to be forwarded to New York is also incorrect. Article III of the services contract clearly states that "the City agrees to pay the Vendor." *See* Dennin Aff. Ex. C. The "Vendor" is in turn defined by the contract as "Creative Socio–Medics Corporation, 146 Nassau Avenue, Islip, N.Y. 11751." *Id.* In fact, CSM did submit invoices to Richmond and Richmond forwarded payments to CSM in New York. *See* Siegel Aff. Exs. 18, 19.

Finally, even though Richmond's contention that it did not and does not maintain physical presence in New York is true, as previously discussed, physical presence is not the sole basis for establishing personal jurisdiction. This case does not involve a "temporary, random, or tenuous relationship" with New York. *Agency Rent A Car Sys., Inc.,* 98 F.3d at 30. After soliciting a bid from a New York corporation, maintaining contacts with New York via telephone and mail before and after execution of the contract, entering into ongoing contractual relationship with a New York corporation, employing that corporation to provide on-going services in New York for

---

**4.** Since CSM's daily rate for additional services varied depending upon the resources required, and the record does not disclose the number, it is unclear how much Richmond incurred in additional services charges.

its benefit in Richmond, and forwarding payments from Richmond to New York, defendant cannot now claim that it did not "purposefully avail itself of the privilege of conducting activities within [New York], thus invoking the benefits and protection of the laws."

### (2)

■ Defendant also argues that this case should be dismissed on the basis of improper venue pursuant to Rule 12(b)(3) of the FRCP because a substantial part of the events giving rise to the claim occurred in the Eastern District of Virginia, not in this district.

Since CSM's complaint alleges diversity jurisdiction under 28 U.S.C. § 1332, the venue statute applicable to this case is 28 U.S.C. § 1391(a), which provides, in pertinent part:

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in ... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred....

28 U.S.C. § 1391(a) (West 1998).

In this case, the omissions giving rise to this action occurred in both New York and Virginia because the dispute concerns whether the parties performed under the Agreement. Richmond allegedly failed to make payments from Virginia, which is an omission that took place in Virginia. CSM in turn allegedly failed to meet any of its deadlines, which is an omission that took place in New York because, as previously established, most of the services to be performed by CSM were to be performed in New York. Accordingly, venue in this district is proper.

### (3)

■ In the alternative, defendant argues that this case should be transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a). "Whether an action should be transferred under section 1404(a) is generally left to the sound discretion of the district court." *Photoactive Prods, Inc. v. AL–OR Int'l Ltd.*, 99 F.Supp.2d 281, 291 (E.D.N.Y.2000) (citing *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir.1993)). In making that determination, the district court is to consider first whether the action sought to be transferred is one that might have been brought in the district court in which the moving party seeks to have the case litigated and, second, whether "the convenience of the parties and witnesses" and "the interest of justice" favor transfer. *Launer*, 916 F.Supp. at 212–213.

Factors in the second portion of the inquiry include: (1) the convenience of the parties; (2) the convenience of the witnesses; (3) the relative means of the parties; (4) the locus of operative facts and relative ease of access to sources of proof; (5) the attendance of witnesses; (6) the weight accorded the plaintiff's choice of forum; (7) calendar congestion; (8) the desirability of having the case tried by a forum familiar with the substantive law to be applied; and (9) practical difficulty, if any. *See id.* Finally, the court should also consider how best to serve the needs of justice based upon an assessment of the totality of material circumstances. *See id.*

■ A party seeking a transfer under § 1404(a) bears the burden to make a "clear" showing that a transfer is appropriate. *See Photoactive Prods, Inc.*, 99 F.Supp.2d at 293. Moreover, "the plaintiff's initial choice of forum is entitled to great weight," and "[w]here the balance of conveniences is in equipoise, plaintiff's choice of forum should not be disturbed." *Id.*

Defendant maintains that this action should be transferred to Virginia because, first, the convenience of witnesses and par-

ties favors trying this case in Virginia. Defendant supports its argument by pointing out that a minimum of twenty material witnesses are located in Virginia and only ten people who were involved in the contract negotiations, software delivery and on-site implementation are located in New York. *See* Def.'s Mem. at 20. CSM counters Richmond's argument by listing twenty-two potential witnesses who are located in New York. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl.'s Mem.") at 21. Moreover, Steve Olson from Washington State stated in his declaration that he will voluntarily appear at the trial in New York. *See* Siegel Aff. Ex. 4. Clearly, the convenience of the witnesses or parties in this case does not weigh heavily in favor of Richmond to override plaintiff's choice of forum.

Second, defendant argues that this action should be transferred because numerous documents relevant to the litigation are maintained in Virginia[5] and the software in issue is located in Richmond, Virginia. *See* Def.'s Mem. at 22–23. Particularly, Richmond claims that the modified version of the Great Plains/Olsen software that is located in Richmond was never loaded on CSM's computer in New York, and the computer containing the software that is located in Richmond exists in an environment different from the computer in New York. *Id.* at 23.

CSM correctly points out that the documents relevant to this dispute are not necessarily limited to those produced during discovery related to jurisdiction. CSM claims that there are many additional documents located in New York that will be produced during substantive discovery. *See* Pl.'s Mem. at 22. Moreover, the record supports plaintiff's contention that

CSM has replicas of the software located in Richmond because its task was to continuously modify, test, and update the software at Richmond's request. Although it is true that a copy of the Great Plains software modified by SolTech was never loaded onto CSM's computer, Nancy Brill, a senior manager of CSM, testified at her deposition that those changes were "superficial" and did not affect the data exchange of the interface. *See* Siegel Aff. Ex. 27. Thus, Richmond has failed to show that the access to relevant documents and sources of proof will be a great inconvenience if the case is tried in New York.

Furthermore, as previously discussed and contrary to Richmond's assertion, the operative facts in this case occurred both in New York and Virginia. Finally, the fact that Richmond is a large municipal corporation with an annual budget of almost $486 million and CSM is a corporation with revenues less than $25 million, *see* Siegel Aff. Ex. 3, while not dispositive, undermines Richmond's contention that it will be more inconvenienced to litigate this case in New York than CSM in Richmond. While it is clearly more convenient for Richmond to litigate this case in Virginia, it has failed to carry its burden to demonstrate that CSM's chosen venue is clearly outweighed by the inconvenience to Richmond. Accordingly, defendant's motion to transfer venue should be denied.

### Conclusion

For the foregoing reasons, defendant's motions to dismiss plaintiff's complaint pursuant to Rule 12(b)(2) for lack of personal jurisdiction, pursuant to Rule 12(b)(3) on the basis of improper venue, and, in the alternative, to transfer to the

---

**5.** Richmond maintains that, as a result of discovery limited to jurisdictional issues only, it has provided in excess of 10,000 pages of documents, whereas CSM produced only 1,768 documents. *See* Def.'s Mem. at 23.

Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a) are denied.